UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 9:19-CR-80030-WPD

UNITED STATES OF AMERICA,

PLAINTIFF,

VS.

AARON SINGERMAN,

DEFENDANT.

Ft. Lauderdale, Florida

January 27, 2022
Thursday

Scheduled for 1:30 p.m.
1:52 p.m. to 4:01 p.m.

Pages 1 - 77

---

**EXCERPT OF**
**SENTENCING HEARING**

BEFORE THE HONORABLE WILLIAM P. DIMITROULEAS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:

ALISTAIR READER, ESQ.
STEPHEN J. GRIPKEY, ESQ.
United States
Department of Justice
450 Fifth Street, N.W.
Washington, D.C. 20530

(APPEARANCES CONTINUED):

FOR THE DEFENDANT:

JAMES D. DURHAM, ESQ.
ROBERT BRIAN TANNER, ESQ.
Griffin Durham Tanner & Clarkson
7 East Congress Street
Suite 703
Savannah, Georgia 31401

RICHARD G. LUBIN, ESQ.
Richard G. Lubin, P.A.
707 North Flagler Drive
West Palm Beach, Florida 33401

WILLIAM J. HUNTER, ESQ.
Oliver Maner, LLP
218 West State Street
Savannah, Georgia 31401

AMY MELISSA MORSE, ESQ.
Morse & Morse
707 North Flagler Drive
West Palm Beach, Florida 33401

STENOGRAPHICALLY REPORTED BY:

GLENDA M. POWERS, RPR, CRR, FPR
Official Court Reporter
United States District Court
400 North Miami Avenue
Miami, Florida 33128

* * * * *

(Videotape concluded.)

MR. DURHAM: Your Honor, the Government's brief questioning, whether or not he's fully remorseful for his crimes is, you can't see that entire clip, where he's talking about chaos theory, butterfly effect.

In a speech that he gave in his wedding, he gave the same speech, talking about he wouldn't change a thing as it relates to his cocaine addiction, heroin addiction, Oxycontin addiction, because if you change one single thing then I don't meet the love of my life.

As it relates to REDCON, in particular, which is the model -- the Gold model. I mean, literally, Your Honor, when Mr. Singerman after his guilty plea was being processed the case agent in this case, came up to him and said, "I use your product, at REDCON 1. That is the Gold standard right now.

And but for turning completely away from that, but for turning completely away from that, REDCON may not exist, where it's employing 250 people across the country, sales in numerous different -- or across the country in nations throughout the world.

Your Honor, this comes down to him falling off the wagon, with undue, incredible stress as it relates to this; and it is within your discretion whether or not to award him the two points for acceptance of responsibility, and I ask that you

do that. Thank you, Your Honor.

THE COURT: All right. I don't think that the December statement at a social event disqualifies Mr. Singerman from acceptance of responsibility. I have no problem with the Government not recommending acceptance of responsibility, because the plea agreement said -- and I confirmed it during the plea colloquy -- that the Government wouldn't have to recommend acceptance of responsibility if he committed any misconduct after pleading guilty, including, but not limited to, breaking the law, and he did. So there's nothing wrong with the Government's not recommending acceptance of responsibility.

The Eleventh Circuit has said that district courts can deny acceptance of responsibility if a defendant later commits a crime, even if it's a different crime or different type of crime from what he was charged with.

And when I took Mr. Singerman and Mr. Braun's change of plea, I told them at the end of the plea, after the Government agreed that they could remain out under the same conditions of pretrial release pending sentencing, that if they were to get arrested between now and sentencing, it would not go very well for them on their open pleas.

Mr. Singerman got arrested. The lawyers presented a proposal to the magistrate judge. He was allowed to remain out on liberty after his arrest, and then he got arrested again.

So I don't think Mr. Singerman is entitled to and, in my discretion, doesn't deserve acceptance of responsibility. It doesn't mean that the fact that he pled guilty is not going to be considered by the Court as a mitigating factor in deciding what an appropriate sentence is.

But in calculating the guidelines, I overrule the objection; and I scored the guidelines at an offense level 28, Criminal History Category I, for a range of 78 to 97 months; is that a correct calculation?

MR. DURHAM: It is, Your Honor.

For the record, the second incident did not involve an arrest, for the record.

THE COURT: Refresh my recollection on the second incident.

MR. DURHAM: The second incident involved Mr. Singerman, and this was a part of the voluntary, after taking Ambien shows up in the hospital after totaling his car. He got tickets as it relates to that, but he was not arrested.

THE COURT: Sounds like an arrest to me, but okay.

MR. DURHAM: Okay.

THE COURT: Any other objections to the presentence investigation report?

MR. DURHAM: No, Your Honor.

THE COURT: Any legal cause to show why sentence should not be imposed?

MR. DURHAM: Your Honor, we have argument as it relates to the 3553 factors. We also have some witnesses to call.

THE COURT: Okay. But any legal cause to show why sentence should not be imposed?

MR. DURHAM: No, Your Honor.

THE COURT: Anything you want to say, Mr. Singerman, before I impose sentence?

THE DEFENDANT: Yes, Your Honor.

After of the -- assuming it's okay for my witnesses to go, I thought I would speak last, if that's all right.

THE COURT: That's fine.

THE DEFENDANT: Yes, sir.

MR. DURHAM: Your Honor, may I proceed?

THE COURT: Okay.

MR. DURHAM: The defense calls Rabbi Arele Dopin.

THE COURT: He can just stand at the podium, if he's comfortable doing that.

MR. DURHAM: I was going to ask questions, Your Honor.

THE COURT: You can ask him from the seat there with the microphone.

MR. DURHAM: Rabbi Gopin, if you could introduce yourself to the Judge, where do serve, for how long, and start with that.

RABBI GOPIN: Your Honor, thank you for allowing me to be here and speak on behalf of Aaron.

I serve with the Chabad of Boca Raton, a synagogue in Boca. I've been serving there since 2013, which is when I met Aaron.

MR. DURHAM: And Rabbi, do you meet with congregants weekly?

RABBI GOPIN: I do. I meet with numerous congregants weekly, usually, a number of dozens of congregants weekly.

MR. DURHAM: And do you know the defendant here, Mr. Singerman?

RABBI GOPIN: I do.

MR. DURHAM: How long have you known him?

RABBI GOPIN: Since 2013.

MR. DURHAM: And are you friends?

RABBI GOPIN: We are.

MR. DURHAM: And tell the Court how that relationship developed.

RABBI GOPIN: As part of my work, as I just said at the synagogue, I go out and about and I try to meet people who are not attending and are not involved. And I was visiting some office -- industrial office spaces and I would meet with people there. I'd go out weekly. I met Aaron on one such visit, it was Chanukah, and I introduced myself, and we started meeting probably about once a month at that time, and over the years have developed a relationship.

At this point in time, we meet once a week for the last

many years. Without exaggeration, we probably haven't missed a week in two years. The one or two times that we have, we've done a phone call or Face Time.

MR. DURHAM: Now, Your Honor, we've provided a letter from the Rabbi, and there was one particular quote that I wanted to ask him about. It says -- you said that, Aaron is one of the most authentic and sincere people that you know.

Why do you think that? Describe that to the Court.

RABBI GOPIN: Your Honor, I'm sure you've read the letter that I sent. I don't want to repeat myself. But there are many, many instances that I've sat in Aaron's office, without exaggeration, for hundreds of hours over the years.

I've seen many, many people over the course of my clergy visits. I very, very rarely see the level of respect. I've, without exaggeration, never seen him raise his voice to anybody, not his employees, not his friends, not his family.

And I've been to many people's offices and homes, and this level of just respecting everybody and really looking at everybody as an equal, not taking advantage of anybody.

And you can see a real respect that people have for him as well in response to that, because I think everybody that met him knew that about him. I mentioned in my letter, literally, the fellow who swept the floors at the office was on a first name basis, he would stop the meetings ask him how his day was going, what was going on.

And that's something I have really rarely ever see.

MR. DURHAM: Rabbi, is there anything else you'd like to tell the Judge?

RABBI GOPIN: There's a lot. I don't want to take too much time, Your Honor. But I've spoken to Aaron at length over the years, especially, in the last few months with everything that's been going on.

As it pertains to remorse, I have actually had this exact conversation that we've watched now on the video. And based on Jewish philosophy, we believe that someone does need to feel remorse -- but we were discussing the line to walk between knowing that you've done something wrong and obsessing over it the point of being depressed, anxious, et cetera; and, on the other hand, learning from your mistakes, that you don't do them again and you can become a better person.

That's a very, very fine line to walk.

I think, if anything, Aaron was walking the other extreme, where he was kicking himself so much over what he did. There is no question in my mind that Mr. Singerman here is extremely, extremely remorseful. That analogy that I gave was something that we actually discussed.

And what I said at the time was, there is a line, and what we've done in the past can never be undone. Our option is to make a choice what to do about our mistakes -- and he literally was quoting that just, in my humble opinion, taken

out of context -- that we can choose, what we've done in the past, do we learn from it, do we make ourselves better people, do we try to educate others?

And I think that the proof is we've done that over many years. My moneties in his law of Shula, repentance, discusses what it means to truly repent. And he said that at somebody's place -- because he's actually discussing someone sells meat as being kosher, and it turns out that it's, in fact, not kosher, how do you know you can ever trust him again? Nobody knows what's going on in the heart of the other person.

Look at his actions. If he ends up in the same industry and he does the same thing, and without anybody watching him, you spot-check him and you see that he's doing everything kosher, then you know that he is, in fact, repentant.

I mean, Aaron, literally, is a textbook case of that. He's shown over the years how he has changed. In the years that I've known him, going back to 2013, I've watched him change. I've watched him become better. Just as a small example, you know, it isn't all about money.

I've seen him -- GNC, which is one of the wholesale customers, filed bankruptcy and he lost seven figures plus. He was not as upset about that as he was about other things in his personal life, when it came to his children, his wife, that was much more important to him.

This situation, the thing that he's done wrong, has bothered him much, much more than losing seven figures, and this was at a time when he couldn't afford to lose seven figures.

He takes more pride over the fact that the guy that started working boxes is here today at $12 an hour is now making six figures and he is successful in his life, and he's grown tremendously, considers Aaron a mentor, he takes more pride in that than the cars he has.

Yes, he has money, and yes, he has nice cars, but that isn't the end goal. The business isn't the end goal. The money isn't the end goal. It's a means to an end, and by him, the end is being a good father, being a good spouse.

If I had two hours here, I wouldn't -- I don't, yeah -- okay.

MR. DURHAM: Thank you very much.

RABBI GOPIN: Thank you, Your Honor, for your time.

THE COURT: Rabbi, I'm sure Mr. Singerman appreciates the support that you're giving him. He'll need that support while he's in prison and when he gets out of prison, thank you.

RABBI GOPIN: And I plan on being here throughout that and afterwards, and continue to improving his life.

Thank you, Your Honor.

THE COURT: All right, let's take a 10-minute recess. I have to take a verdict from the jury that's deliberating.

MR. DURHAM: Thank you.

THE COURT: And we'll be in recess for a few minutes.

COURTROOM DEPUTY: All rise. All rise.

(Recess taken from 2:28 p.m. to 2:38 p.m.)

THE COURT: We're back on the record.

Counsel is present. Mr. Singerman's present.

Mr. Durham, you may call your next witness.

MR. DURHAM: Yes, Your Honor.

The defendant calls Sean Rosario.

(SEAN ROSARIO approached the podium.)

MR. DURHAM: Mr. Rosario, could you identify yourself to the Judge, tell him who you are and what is your profession.

SEAN ROSARIO: Yes, sir. My name is Sean Rosario, former Navy Seal, and I run a charitable foundation now for special operations veterans.

MR. DURHAM: And what's your educational background?

SEAN ROSARIO: I have a degree in business, University of Phoenix; and executive education from Columbia University.

MR. DURHAM: Now, you mentioned you're a former Navy Seal. Did you deploy in any conflicts?

SEAN ROSARIO: Yes, I did.

MR. DURHAM: In how many?

SEAN ROSARIO: I deployed four times; three to Afghanistan, one to Iraq.

MR. DURHAM: And have you received any awards or

accommodations as a result of your service?

SEAN ROSARIO: Yes, I have. Navy accommodation medals, combat action ribbons, bronze stars, with "V" for Valor.

MR. DURHAM: Are you still in the Navy?

SEAN ROSARIO: No, sir.

MR. DURHAM: Are you familiar with the Warrior Health Foundation?

SEAN ROSARIO: Yes, I am.

MR. DURHAM: What is it?

SEAN ROSARIO: Warrior Health Foundation is a 501(c)(3) charitable organization that provides healthcare services to special operations veterans, whether they be in the Army, Navy, Air Force, Marine Corps.

MR. DURHAM: And what is your role in that?

SEAN ROSARIO: I'm the president and founder.

MR. DURHAM: And how long has it been in existence?

SEAN ROSARIO: Officially, since May of 2018.

MR. DURHAM: Do you know Aaron Singerman?

SEAN ROSARIO: Yes, I do.

MR. DURHAM: How do you know him?

SEAN ROSARIO: We were introduced in the summer of 2018.

MR. DURHAM: And do you consider him a friend?

SEAN ROSARIO: Yes.

MR. DURHAM: And what involvement does Mr. Singerman

have in the Warrior Health Foundation?

SEAN ROSARIO: Aaron's always been very interested in what I do, as far as support that our foundation provides for special operations veterans. He's very passionate about the cause, as well as for law enforcement members as well.

But he's very passionate. He wants to always -- he's always asking what we're doing, how the guys are doing, and however he can help.

MR. DURHAM: Has Mr. Singerman been instrumental in the success of Warrior Health Foundation?

SEAN ROSARIO: Yes, he has.

MR. DURHAM: How so?

SEAN ROSARIO: Well, I would say he's been a very important donor. He enjoys and appreciates the work that we do, so he's been very helpful.

MR. DURHAM: Now, are you aware of whether or not Mr. Singerman provides any additional money and support to other military charities?

SEAN ROSARIO: Yes, he does.

MR. DURHAM: And how do you know that?

SEAN ROSARIO: Just in personal conversations with him, he's expressed how he's -- if he can help any cause that's near and dear to his heart, he absolutely does that.

MR. DURHAM: Now, you mentioned that you were a friend of Aaron's.

SEAN ROSARIO: Yes, I am.

MR. DURHAM: Can you describe your friendship?

SEAN ROSARIO: It's a great friendship. He's a very humble man and has always welcomed me into his home, to his business, and it's -- I consider him a very good friend.

MR. DURHAM: And have you observed Aaron around his family?

SEAN ROSARIO: Yes, absolutely.

MR. DURHAM: Could you give some examples to the Judge.

SEAN ROSARIO: First and foremost, Aaron is a tremendous father to his three boys. He's a great husband to his wife, Darielle, and he's just -- he instills life lessons into his children, always stressing the Singerman Rules, and I think it's a great model for raising young boys and it couldn't come from a better person.

MR. DURHAM: And is there anything else you'd like to tell the Judge with regards to Mr. Singerman?

SEAN ROSARIO: Your Honor, the man that sits here before me is a -- he's a very humble man. He's overcome incredible odds, in my opinion, in the past with regards to substance abuse. He even provides counsel to other people dealing with substance abuse and how to overcome that.

Your Honor, I would humbly ask yourself to give him a break and see that he is the man that I've described today and that we all know him to be.

MR. DURHAM: Thank you, Mr. Rosario.

THE COURT: I appreciate you being here today.

SEAN ROSARIO: Thanks.

MR. DURHAM: Your Honor, I call the defendant's wife, Darielle Singerman.

(DARIELLE SINGERMAN approached the podium.)

MR. DURHAM: Darielle, how long have you been married to Aaron?

MRS. SINGERMAN: We've been married 10 years in June.

MR. DURHAM: And how many children do you have with Aaron?

MRS. SINGERMAN: We have three boys, ages 9, 6 and 4.

MR. DURHAM: What are their names?

MRS. SINGERMAN: Ashen, Aiden and Alijah.

MR. DURHAM: Mrs. Singerman, your husband left Blackstone Labs in 2016; is that correct?

MRS. SINGERMAN: Yes.

MR. DURHAM: And he founded REDCON1 in that same year; is that right?

MRS. SINGERMAN: Yes.

MR. DURHAM: Now, since leaving Blackstone Labs, have you witnessed any growth in your husband?

MRS. SINGERMAN: Yes. In every aspect of his life, as a businessman, as a father, a husband, a person in society, and his overwhelming desire to give and give back.

MR. DURHAM: Now, with regards to your children and growth in Mr. Singerman, what have you observed?

MRS. SINGERMAN: He takes a tremendous amount of pride in being a father; like Sean had said, he made the Singerman Rules, which are 10 principles to live your life by; and he spent more and more time with the kids as a father, even as the business was getting larger, he made the kids and myself, family, a priority more and more.

MR. DURHAM: With regards to his business, you've also said that you witnessed some growth. What do you mean by that?

MRS. SINGERMAN: He's -- everything from Blackstone was a different person; that was not the man he is, and it's not the man that he went into REDCON. He took things that, whatever actions that happened in the past and kind of gave himself -- it was a second chance to do everything the right way, to do everything -- to set an example for anyone else in any type of business.

He has been on a constant pursuit of improving himself mentally, physically, spiritually, and everything about Aaron is about just improvement.

MR. DURHAM: Now, before marrying Aaron, you were aware of his past struggles with substance abuse?

A. Yes.

MR. DURHAM: And did he continue abusing drugs while you were married?

MRS. SINGERMAN: No.

MR. DURHAM: Let's talk about the more recent alcohol abuse. Can you tell the Court when you first started to notice?

MRS. SINGERMAN: Yeah, he started drinking a bit more about a year ago, and then within the year it started -- it gradually started picking up. And then after the plea, he basically transformed -- he turned into an unrecognizable person that I've been married to, that was not him.

MR. DURHAM: And did you ever discuss with your husband why his drinking increased over time?

MRS. SINGERMAN: Yes. It was the stress, everything, just living over, you know, his head, our head. I think after the plea there was a lot of anger with himself for things he had done in the past and what me and the kids would be going through. And I think that was -- it was very hard on all of us, and it led to that.

MR. DURHAM: And has that put a significant strain on your marriage?

MRS. SINGERMAN: Yes.

MR. DURHAM: Now, when Aaron's bond was revoked and he's been in jail since that time, about, you know, over a week, have you received responses from people that know Aaron?

A. Yeah, I've received hundreds of messages of -- text messages, calls, e-mails. It's been overwhelming, the amount

of people that have reached out.

MR. DURHAM: And what do these messages say?

MRS. SINGERMAN: Everything from, you know, expressing how much Aaron had directly helped them, or indirectly helped them -- or Aaron is not even sure who they are, but from his actions and from what he's done has changed their life and everything in between.

MR. DURHAM: And I think you have an example of one of the text messages --

MRS. SINGERMAN: Yeah.

MR. DURHAM. -- that you've received --

MRS. SINGERMAN: Yes.

MR. DURHAM: Is this from a mother whose child was stricken with cancer?

MRS. SINGERMAN: So, this boy -- the mother wrote me, her son was diagnosed with cancer and Aaron sent them -- in addition to monetary donations sent continuous supplement protein powder so her son could keep weight on.

MR. DURHAM: And could you read that for the Court?

MRS. SINGERMAN: Should I read -- yeah.

"We are beyond grateful for the generosity shown to our family while we fought alongside Tripp this past year. Monetary donations were so gracious. But beyond that, the gift of supplements for trip are what I attribute to his ability to stay off the feeding tube on treatments.

Aaron didn't hesitate to send a care package for Tripp when I was scrambling to figure out how to keep weight on our boy. He continues to use meal replacements daily and has made so much progress. We appreciate you all as a family."

MR. DURHAM: And again, these are one of the hundreds of messages that you've received since Aaron was locked up?

MRS. SINGERMAN: Yes.

MR. DURHAM: Now, have you and Aaron -- before Aaron went to jail, did you and Aaron tell your boys what was going to happen?

MRS. SINGERMAN: Yes.

MR. DURHAM: And you told them that he was going to jail?

MRS. SINGERMAN: Yes.

MR. DURHAM: And how are they doing?

MRS. SINGERMAN: Not great.

MR. DURHAM: Aaron turned 42 on Sunday; did he not?

MRS. SINGERMAN: Yeah.

MR. DURHAM: And tell us, tell the Court about the celebration.

MRS. SINGERMAN: We got cupcakes and all talked about Aaron and sang Happy Birthday.

MR. DURHAM: Thank you, Darielle.

MRS. SINGERMAN: Thank you.

THE COURT: I appreciate you being here today.

MR. DURHAM: Your Honor, Mr. Singerman has some remarks.

THE COURT: Okay.

THE DEFENDANT: Your Honor, do you want me to read it right here; is this okay?

THE COURT: That's fine.

THE DEFENDANT: Thank you for letting me speak, Your Honor. I want to just start with the truth; and the truth is I knew what I was doing was wrong back in the Blackstone days from 2012 to 2016.

We started to sell Blackstone products that were illegal or on the very edge of regulation, and I have no excuses, you know, I could say I was younger, I was an inexperienced businessman, you know, that all kinds of excuses I could come up with. But the truth is that I knew that it was wrong even back then.

And I want to apologize to the consumers that were mislead by our products, that believed it was something else or that we were telling them it was FDA approved when it wasn't. I want to apologize to the Government, because we were doing what we could to avoid attention and skirt bylaws.

A lot of people come to this Court and speak to you, I'm sure, Your Honor, and say things like I just said. But I think the difference is that I can back that with six years -- almost six years of action.

It would have been very easy for us to -- or for me to start another company and copycat the things that Blackstone did and the success that they had by doing the things that they did. That would have been the easy way out. And instead of doing that, we did the complete opposite, we started the company REDCON1.

And at the moment when I left Blackstone Labs, it was a -- it seemed like -- because I left on a partnership dispute -- it seemed like that was the end of the world, like it was the worst thing that could have ever happened; but, in fact, it was the best thing that ever happened because it created an inflection point in my life where I had to make a decision who do I want to be.

And Darielle and I were -- just had our second child, Aiden, who's six, and me and her both talked about how we were not proud of Blackstone Labs. Darielle didn't wear the shirts anymore, you know, when she went to school, she was embarrassed that people would look up the name because it was on the back of the car and look up the kind of marketing we were doing, and she's embarrassed about it.

And I remember us talking about, you know, If I start over, if we try again, I would never want to do the same thing again. I would want to have a company that I would be proud of; and not just me proud of, her and the three boys -- or the two at the time -- I wanted Aiden to grow up being proud of

REDCON1, not embarrassed of it.

And so what we ended up doing, when we started that new company, REDCON1, we looked at all the things that we did wrong and made a pact, myself, Eric Hart -- who's now the president of REDCON1 and running the business' day-to-day operations today like that -- and Eduardo Silva is my chief of staff, we're not going to do anything like that.

We're going to build a team that we're able to create a major change in the industry, do the right thing by our customer base and follow and be compliant in every aspect.

And I hired a chief legal officer, J. Manfre.

We hired -- of course, Eric Hart had 20 years in the history, experience, so he was able to make sure that we're complaint. We have a CFO, Kevin Flint. We have a chief compliance officer, Anthony Connors, and a long list of other people that are part of my leadership team that are running the business right now.

And we -- by creating this business with these type of people, they guaranteed that we wouldn't be doing the same type of things again. And even J. Manfre, who came on as our chief legal officer, when I interviewed him in the very beginning he said, I need to have full approval of every product and every ingredient, and I was excited to have him do that to make sure we stayed compliant.

Eric Hart and I, in 2016, went and took a trip to get

GMP certified, so we were actually knowledgeable about what it takes to be a good manufacturing processees and products. So we went past -- very few supplement companies ever send their executives to get these certifications, but we figured if we're going to be totally different we need to start by compliancy and being efficacious.

So REDCON1 has two things that really separate us and make us a purpose-driven company. And what does purpose-driven mean? For me, it means to make a positive change on the world. And when you're selling sports supplements, that's not an easy fete. There's no other competitors out there that are doing this or making that a priority.

So, for us, how do we do it. We pretty narrowly focused on helping military families, helping veterans and active duty service men and women in all branches of the military.

And we've done that in terms of, you know, over a million dollars in donations to various charities, starting our own REDCON1 foundation, which every month, something major for military family; like recently, one of the Marines that, unfortunately, got laid off due to COVID. He needed -- basically, laid off due to COVID.

He got COVID after, and he was in trouble where he couldn't pay his mortgage, he was going to lose his house, and so we ended up paying a year mortgage for this officer and made

a huge difference in his life; and that's the purpose of the REDCON1 Foundation, it's not just to give money but to make a major change in the life of service men and women and their families.

We also helped Gold Star families, where they lost a member of their family due to combat.

So, you know, the other thing is efficacious -- efficacy, and also, basically, having the customer believe in us, believe in REDCON1. And that's been the two big prongs, making sure what's on the label is in the product and that the customer -- our customer believes in us to such an extent that they don't have to ever worry about anything with the products.

And those two things have grown the company very rapidly into being the number one brand at WalMart, at GNC, Vitamin Shoppe, military bases around the country, around the world, Florida operating bases, Amazon, and over a hundred countries worldwide. And I'm very proud, and the boys are very proud of the brand. And it is the pinnacle -- REDCON is the pinnacle in the industry when it comes to consumer safety and regulatory compliance.

There's a lot of people here today, Your Honor, that came to support me and, you know, you just witnessed my wife, who's extremely nervous to get up and speak -- she does not like -- you may have saw on the video when she was in the red dress and I put the microphone to her -- she doesn't like to be

in the spotlight, she does not want to speak in public for anything; and so what she just did is a huge deal, because it wasn't easy for her. It doesn't come easy like it does for other people, like it does for me. It's a very big deal.

And I want to thank her, and I want to thank everybody else, people who flew in from across the country to support me, and Olive, who's been helping, and everybody else. You know, the big thing for me is that I ask people to -- in this tough time to continue supporting me by supporting Darielle and my boys, 'cause those are the ones who are going to need it the most. You know, my parents -- my parents taught me to generous and kind, and I teach those same values to the kids.

So one of the things that Sean Rosario brought up is the Singerman Rules, and my kids -- my kids are young, as Darielle said, nine, six and four, and the hardest thing I had to do throughout this entire process -- and one of the major things that gave me tremendous anxiety is telling them, you know, that daddy's -- what daddy did.

And one of the Singerman Rules is tell the truth, no matter what and -- sorry, excuse me. You can understand how it's difficult to explain to little kids how dad, you know, didn't follow his own rules, you know. And also, at the same time, you don't want them to think that daddy's being unfairly prosecuted, daddy's being treated -- mistreated, the Government's not fair.

So I had to figure out a way to tell them what I did so they can understand that there's penalties when you do things wrong and, you know, there's repercussions that have to happen; but at the same time, I didn't want them to think, you know, that I'm a bad guy.

So it was very difficult to tell them, and it caused me tremendous stress and anxiety going up to it, and then doing it, and then worry about how they were going to react. You know, my oldest -- my oldest cried, and my middle child left the room, and my youngest told me he was going to break me out of jail before you ruled.

So, you know, I know there are consequences for my actions, you know. I tried to leave those actions in the past, many years ago. And I know that's why the Court must demonstrate to everybody today that repercussions need to come to actions.

I'm ashamed to be here in front of the Court already wearing the prison jumpsuit after being found in violation for my bond. And I realize that you let me stay out of jail after the indictment for years, and even after my guilty plea, and let me be there for those years for my wife and my kids and see my kids grow up these past few years, and I want to thank the Court for that opportunity.

All I can say about the bond violation is that I broke under more stress that I've ever experienced. Pleading guilty

and the fallout from that and worrying about how it was going to affect my family led me to terrible decisions, you know. I thought that my addiction was in my past, that that demon was over and that I had conquered it.

And I had come to find out, you know, unfortunately, in the worst way that I was wrong, and that it was there, it was just waiting. But I want the Court to know, I'm not wavering in my admission of guilt my responsibility for these crimes.

I'm stressed beyond words about the prospect of leaving my family. And I don't take a word of my guilty plea back. I violated the law, I sold controlled substances under guise of dietary supplements. I mislead consumers by selling the products at Blackstone Labs as legal supplements when they absolutely were not.

My involvement of those crimes is nobody's fault but my own, and I will never be involved in anything like that again. I made the decision to change six years ago when I left Blackstone, and I followed through with that, all the way up to today, in my decision with the new company, and just like I followed up with my guilty plea.

And so, Your Honor, you know, I'd like to ask as much mercy as you could possibly give so I could continue doing the things that I'm proud of, and doing the things for my wife and my children, and for my community. And I understand and fully realize that I'm at the mercy of the Court and whatever

sentence you decide is reasonable is what I will accept, but I would like to ask that for some leniency if it's possible.

Thank you, Your Honor.

THE COURT: Anything further before I impose sentence?

MR. DURHAM: Yes, Your Honor, I have argument.

THE COURT: Go ahead.

MR. DURHAM: I will come to the lectern.

Your Honor, under the 3553 factors that you have to consider, I point Your Honor to (a)(6) under 3553, the need to avoid unwarranted sentencing disparities. This is a case about anabolic steroids sold as dietary supplements, and we identified -- as we had pointed out in our sentencing memo -- the 19 cases across the country that the Government has prosecuted that are very similar to this case.

And we didn't randomly pick this category; it was how it was described to us by the Government. I had conversations with the Government, Your Honor, as it relates to this case, and Mr. Singerman.

And in those conversations, I would point to the Government and say, you know, in some steroid cases in the Southern District of Florida, the sentences are actually pretty small; and the response by the Government was, Jim, this is not a steroid case. It is a fraud case.

And so those were the cases that we picked, the anabolic steroids sold as dietary supplements, not random.

The highest, Your Honor, that has been imposed in those 19 cases across the country is 19 months.

THE COURT: Well, let me ask you about that because one of the cases that you pointed to was the United States versus Sitish Patel out of the Western District of Virginia; right?

MR. DURHAM: That's right.

THE COURT: And he got eight months followed by probation?

MR. DURHAM: That's right.

THE COURT: And in your memo you said that the judge justified the downward variance because, to him -- I guess that's Judge Jones -- the length of the sentence is less important than the fact that the sentence exists.

MR. DURHAM: That is what the judge said.

THE COURT: But just because Judge Jones feels that the length of the sentence isn't significant, and just because Judge Jones feels that the fact that someone's sentenced is enough deterrence and enough punishment, that doesn't mean that everything falls to the lowest common denominator to his view of the sentencing laws; does it?

MR. DURHAM: No, but that's not the view of just Judge Jones. That's the view of --

THE COURT: Well, let me ask you about that because didn't Mr. Patel go to the Northern District of Texas after that and get 41 months in prison?

MR. DURHAM: Right. And that was the case that we cited, Your Honor, where there was 400 million dollars of fraud, there were deaths associated with that case.

That is the case that we referenced that -- where the lead defendant in that case, Your Honor, 400 million dollars in fraud, deaths, people getting liver transplants as it relates in that case, the highest sentences meted out in that case was 60 months -- the highest.

Mr. Patel got the 41 months. Mr. Patel, in the first case that you reference, went to trial, testified, and came out with a nine-month sentence. Now, that doesn't, you know -- if we just had one case, Your Honor, okay.

But as it relates to these cases that are being brought by the Government throughout the country, and the need to avoid unwarranted sentencing disparities, we have across the board how these cases are being treated.

And in the early days, Your Honor -- and this was a result of how the Government was prosecuting these cases -- in the early days, Your Honor, you're getting corporate pleas. Corporate pleas. Same conduct, corporate pleas.

And then after the Eighth memo comes out, individual responsibility, individual accountability -- then all of a sudden you see all these individuals who are getting charged with these types of crimes; and across the country, you're getting these sentences.

I will point Your Honor to the Houser case. Mr. Houser had this case going to trial, was going to testify in this case. He was the manufacturer for Blackstone. Maybe the biggest point that is raised in the sentencing memo by the Government when they go -- you know, there's about four million doses of anabolic steroids that were distributed by Blackstone, okay. But in Mr. Houser, who supplied Blackstone, supplied -- you know, any variety of the Blackstones that are out there.

Blackstone, as it relates to the 10 percent of their business that we're talking about, 2.9 million dollars, Houser was a primary supplier, which means he's getting it in from China, he's making it, he's slapping the labels on it, and then he's delivering it down to Blackstone.

And he's doing that with dozens of other Blackstones across the country. And so if the Government says the biggest thing in here is the four million doses, or however many doses you're talking about, times that by 20.

And do you know what the Northern District of Georgia did with regards to Mr. Houser? Probation, that's what they gave him related to this case. And his business partner, who I don't believe did cooperate, probation. That's how these cases are being treated across the country.

And so, notwithstanding talking to me and saying, Hey, Mr. Durham, this is a fraud case; when actually faced with the fraud-type cases across the country, the Government all of a

sudden says, Wait a second, this is a steroid case.

And let me show you, Your Honor, what type of steroid cases there are out there, and they point you to three underground steroid labs with hallmark of drug dealing, guns, obstruction, whatever.

Not even close to what we're talking about here.

The products that they were selling, there is no walking back on the illegality of what they were doing. But let's not say that this is an underground, injectable steroid case when the products that they were selling, prohormones -- before 2012, GNC was selling them; and then you come out with DASCA, and they're out.

And these guys kept selling it, and it's criminal.

But, I mean, these are how these cases are being treated across the country; and so, they, for example, they cite to this U.S. -v- Kesto (phonetic), where somebody used aliases, encrypted cites on the dark web, fraudulent bank accounts, home basement lab. They were stealing personal identified information. There was a convicted felon -- and let's layer this on top of it, the case that they're asking Your Honor to say this is similar to -- this guy's trading an AR-15 for steroids. How is that similar?

U.S. -v- Root, nation's largest underground lab of injectables, banned since 1990. And the person involved in that pressured co-conspirators to use their friends and family

members to launder money to and from China, involving an individual that was a recidivist. Not close.

The last one that was identified, U.S. -v- Lambert, distributing steroids using underground internet forum. The guy was arrested, he was sentenced, he bolted; and then they caught him again, and then he was sentenced. And, Oh, by the way, there's firearms involved in that one as well.

Not even close. So just as it relates -- Your Honor, in our sentencing memo we made a recommendation as it related to a sentence. And, you know, I'm sure read it, so you know. We recommended that Mr. Singerman receive a 20-month sentence, and that was not just picked out of the air. That is as it relates to anabolic steroids sold as dietary supplements will be the largest prison sentence given in the country relating to these cases. The largest.

Mr. Singerman has voluntarily agreed and paid, as of yesterday, 2.9 million dollars in forfeiture, which is also the largest. So, as it relates to any deterrence that the Government would want, the Government could -- and they do, we see them -- they put in a press release, largest sentence ever given, largest forfeiture ever given. That is the general deterrence that would satisfy in this case.

So as it relates to avoiding unwarranted sentences, Your Honor, I think it is pretty clear how these cases have been treated across the country.

What I would like to switch to, Your Honor, is to talk about the nature and circumstances of the offense and the history and characteristics of the defendant.

And you have the letters, Your Honor. There's 22 of them. There could have been a whole lot more. There were a whole lot more, but, you know, we made the decision not to overwhelm Your Honor.

As Aaron mentioned just a second ago, he's very thankful for the folks that have been here. I can tell you there were many, many more that were going to come and I put the kibosh on it, quite frankly, because I didn't want to overwhelm court staff in terms of, you know, us being in a pandemic and being in close quarters.

But I'll just do the juxtaposition of what happened in 2016 and where we are today, because Your Honor has to look at the characteristics of the defendant. And there was this change in 2016. What Mr. Singerman talked about being the worst thing in his life turned out to be the best thing in his life. Going away from criminality, in founding a company that everyone is proud of, including the Government agency. I mean, I don't know why FDA is not saying this is the model as it relates to REDCON1.

There's -- and there's, you know, like Mr. Reader, I have not known -- I haven't known him for as long as some of the other folks that have been in this case, but I do object to

the characterization of Mr. Singerman as REDCON, you know, being formed on the shoulders of Blackstone. This is not a case where some drug dealer who's made however much goes and buys a car wash and then wants to tell the Government later on -- - using the proceeds of his criminal activity, and he wants to tell the Government later on, Hey, I'm a businessman now, look at me, I mean, don't come after me, I'm a businessman now.

As I believe is stated in the presentence report, not a dime of Blackstone money was used to start REDCON. What Aaron got was a $500,000 loan of product that he had to sell within 60 days without having any idea whether or not this was going to work. Hey, I'm going to try something new. I know that the sports supplement industry is just torn up with criminal activity. I'm going to go the complete opposite and we're going to do everything better, and I've got no idea how that is going to work. And it absolutely worked.

As you know, Your Honor, from just looking at the PSI, that $500,000 in product has turned into a monster that is being sold in GNC, in Wal-Mart, in whatever.

And the other thing that I have to object as it relates to the Government's characterization of Mr. Singerman and REDCON. REDCON was a hurdle. It was not a push. It was not a help. REDCON was a hurdle, because when Aaron is initially going to these folks, the responses, Well, you're from

Blackstone, you're from, you know, take a look at your website, take a look at the stuff that you're selling. I mean, he had to go out there and convince people that he no longer was Blackstone. It was not a help, in the least.

And so, Your Honor, in 2016, he's booted out of Blackstone, begins REDCON1. And the juxtaposition is this. When he's getting $500,000 in product to start this company totally legit, Blackstone is putting up Dr. Boccuzzi with the certificates of free sale.

In 2017, when P.J. Braun is obstructing a federal search warrant, Mr. Singerman is getting his Good Manufacturing Practices Certificate. In 2020, when P.J. Braun -- as pointed out by the Government in a 404(b) notice, when P.J. Braun in 2020 is selling injectable steroids, Aaron is building the REDCON Foundation and becoming the Gold standard in the supplement industry.

And when Aaron, in 2021, pleads guilty, November of 2021, you've got the head of Blackstone sending out his surrogates telling him what a rat he is. That's the juxtaposition that you have, Your Honor, as it relates to Mr. Singerman.

THE COURT: What's the motivation for Mr. Braun to do that if he pled guilty the same day?

MR. DURHAM: If he pled guilty the same day?

THE COURT: Right.

MR. DURHAM: Well, because the rationale for him pleading guilty was Mr. Rat here, who is going -- who has broken the code, or whatever, and he stood up to the code and did -- the videos are clear, Your Honor. I mean, this guy, on day one says, I talked to P.J. every single day; and as soon as this sentencing is over, I'm going to bust everything as it relates to this case.

And then the very next day he talks about Mr. Singerman being the rat and that P.J. Braun was his first victim.

And the difference is, Your Honor, the timing of the plea makes all the difference in the world because Mr. Singerman signed his guilty plea -- signed his plea agreement first. It was you, Your Honor, that scheduled the two guilty pleas together.

But Mr. Singerman signed his guilty plea first. He agreed to cooperate. And within 20 -- and this is probably one thing that I should have made clear, Your Honor -- within 24 hours of Mr. Singerman signing his guilty -- signing his plea agreement, P.J. Braun signed a plea agreement with the Government as well.

THE COURT: I guess my question is, what's the motivation for Mr. Braun to intimidate or try to influence Mr. Singerman's cooperation after Mr. Braun's already pled guilty?

MR. DURHAM: Well, I don't know that he's necessarily

trying to intimidate or, you know, de-rail his cooperation. I just think he's absolutely sticking it to him, and he's got his buddies that are going on a YouTube, and whatever, trashing him, saying what a rat he is. I mean, that's the motivation.

The motivation is just to, you know, I never would have done this but for the rat, you know, I would never have cooperated, I know what the code is, whatever Nick Trigili is saying on those YouTube videos. Okay.

But that's -- I mean, that's one of many as it relates to juxtapositions between where Aaron was in Blackstone at the end, or in April, May of 2016, and then afterwards, when he started REDCON1, there's an absolutely -- a different man, a change in circumstances.

Again, Your Honor, we did not pick a 20-month sentence out of the air. It would be the largest sentence in this type of case, the highest forfeiture as it relates to the need to provide restitution, which is another factor.

Again, the 2.9 million dollar forfeiture, any victim of Blackstone could apply and get restoration, in terms of victim relief. Mr. Singerman --

THE COURT: Well, tell me if I'm wrong, the probation report also is indicating a restitution amount in addition to the forfeiture of $33,155.23; is that correct?

MR. DURHAM: That is correct, Your Honor, and we have represented -- and I'll represent today -- that in addition to

any victim that can go to the forfeiture amount and get restoration, we're going to cut a check for the entire amount of the restitution.

I mean, that is extraordinary for a criminal defendant whose means has nothing to do with the conduct that we're talking about today and everything to do with the change in his life and the start of REDCON1.

I believe, Your Honor, that a 20-month sentence is tailored to this case and to this defendant. It promotes the respect of law regarding deterrence and punishment. It avoids sentencing disparities. It recognizes the circumstances of this individual defendant, Aaron Singerman.

Your Honor, one additional thing, outside, as it relates to Mr. Singerman -- and you've heard a number of things and you've read a lot about Mr. Singerman and his substance abuse, and I would ask Your Honor to recommend that he be allowed to participate in the Bureau of Prisons RDAP program; and to the extent that you, in terms of where Mr. Singerman will be sent, we ask that you represent Pensacola so he can be close to his family. Thank you, Your Honor.

THE COURT: Let me hear from the Government.

MR. READER: Thank you, Your Honor.

There are just a few factual issues that I want to address up front, Your Honor. It is correct that Mr. Singerman was removed from his leadership position at Blackstone Labs in

the late spring of 2016 and he no longer had control over what the company was doing then.

However, there is evidence that he was aware the company was still engaging in wrongdoing and a number of their products beyond steroids are products that the defendant as admitted were illegal in his factual proffer, and those form the basis -- the backbone, really, of Blackstone's profit going forward in 2016.

And Mr. Singerman may not have been managing the company, but he was certainly cashing the checks. And he continued to receive his 35 percent cut each month in 2016. And while understanding that this was a company that had been built on a lie, built on criminal activity, and was continuing to sell illegal products, whether or not they were steroids.

As Your Honor knows from the factual proffer, from the pleadings and the sentencing, and from the trial of co-defendant James Boccuzzi, Mr. Singerman was a key leader of the conspiracies here that were executed at Blackstone Labs.

And he, along with his co-conspirators, particularly, Mr. Braun, the other owner, earned millions of dollars from criminal activity without any regard for the health of their customers.

There are really three reasons that Mr. Singerman ought to be sentenced within the guidelines. The veneer of legitimacy that he put this giant steroid company under, the

volume of products that were the result of their conduct, and the victims, the victims of Blackstone Labs.

The veneer of legitimacy is a key issue here, because this is correct, this was not an injectable drug, steroid trafficking ring run underground. It was run in broad daylight on the internet, with advertisements on Facebook, with a website bragging that their products were the best quality products.

And as Mr. Singerman admitted, that they were claiming these products were FDA approved, and they sold them in thousands. And many of these products were steroids that were sold to body builders who wanted steroids. There's no question that there were people who purchased Blackstone's products 'cause they knew that's what it was, and they believed that's what it was. But there were also unwitting customers, people bought these products, because without expertise in this area, they had no reason to know that they were purchasing unsafe products. These were regular people.

And the scheme only worked because it was brazen and had this veneer of legitimacy on it, and that's the only reason that it was so successful, that they were able to distribute the millions of dollars of steroids.

And that calling these products "dietary supplements" was a very big lie, and a lie that was absolutely responsible for this company continuing from 2012 all the way into 2017

when law enforcement's investigation became overt; and that conduct was dangerous, and it was dangerous to thousands and thousands and thousands of consumers across the United States, and it was dangerous to the people who were actually hurt.

Now, Mr. Singerman is not disputing that he knew this conduct was illegal, and the evidence shows that he and his codefendants also knew that it was also dangerous. And as you saw, there was one exhibit to the Government's sentencing memo, which is an e-mail involving Mr. Singerman and Mr. DiMaggio in 2014, where a scientific case study is published about one of their products, Blackstone Labs, Super DMZ, and a young individual who was hospitalized after taking that product, and his doctors published this information in a scientific journal so that it could be accessible to the world out there.

And Mr. DiMaggio forwarded that article to Mr. Singerman, who said that he was aware of it, and they discussed what liability it might be for their company.

Now, that case study was a real person. You have a victim impact statement from the very person that was the subject of that case study. I'll put his initials on the record, L.V. He talked about what that really meant to his family, those hospital stays, and how big an impact this was on his life.

But the fact is, is that the conduct in this case not only lasted for years, but it lasted for years with the

knowledge that these products could and were hurting people.

But they were very lucrative and that Mr. Singerman participated until he was removed from the company and continued to collect his paychecks after that.

The issue of deterrence here is real, Your Honor, and there's a, I think, a healthy debate about what an appropriate sentence is here. I think it's important that the Court send a message that conduct like this, conduct that endangers thousands of people is unacceptable.

And, in particular, this is a case where there was literally a law written to prevent this kind of conduct, the Designer Anabolic Steroid Control Act was passed by Congress, specifically, because of the concern about steroids being sold as dietary supplements, a law designed to prohibit and punish this kind of behavior.

As Your Honor knows, there's been a lot of debate through counsel about the meaning of that law, but ultimately the evidence showed -- and the defendant has admitted, to his credit -- that they always knew these products were illegal. And that in 2015, they knew the law had changed, and that these products were steroids; whether they're on a list or not somewhere, these kinds of products are anabolic steroids, and it is unsafe and illegal to sell them.

So the Government would argue that deterrence is particularly important in this case, where prior defendants

have received sentences of a variety of ranges to run a company for years selling millions of doses of steroids, plus a number of other illegal products, causing enormous risks to consumers is the sort of conduct that future defendants, future individuals should look at, say, I cannot do that, I cannot do that, or the consequences will be very severe.

I think the key issue here is, is the defendant here has raised no reason why the guidelines for Mr. Singerman are not reasonable. The purpose of the guidelines is to avoid disparate sentencing, and the Government is arguing for a guideline sentence for Mr. Singerman as a result of these crimes.

THE COURT: Let me ask you a question.

Mr. Singerman signed his plea agreement on November the 10th?

MR. READER: Yes.

THE COURT: And on November the 10th the plea agreement contemplated the possibility of substantial assistance, but there's been no motion for substantial assistance.

Why is that?

MR. READER: Thank you, Your Honor.

I'd say after -- the Government is not intending to file a motion for substantial assistance. After internal discussions and consultations with supervisors that decision was made.

I should proffer to the Court that Mr. Singerman did seek to cooperate and did cooperate. He did proffer after he pled and provided information specific with regards to Mr. Boccuzzi, who was then the only person still pending for trial, and he produced documents relating to Mr. Boccuzzi.

THE COURT: Let me ask you a question.

When he signed the plea agreement, wasn't Mr. Braun awaiting trial?

MR. READER: That's correct, Your Honor.

I think it is a fair characterization that Mr. Braun's plea followed Mr. Singerman, that is a correct characterization.

THE COURT: So at the time Mr. Singerman signed his plea agreement, was it a possibility that the Government would be calling Mr. Singerman to testify against Mr. Braun?

MR. READER: Yes, that was a possibility.

THE COURT: And would it have been a possibility that Mr. Singerman would have been called to testify against Mr. Boccuzzi?

MR. READER: Yes, and Blackstone Labs, Your Honor.

THE COURT: And you didn't call Mr. Singerman to testify against Mr. Boccuzzi or Blackstone Labs?

MR. READER: That's correct.

THE COURT: And is there something Mr. Singerman did that prevented you from doing that?

MR. READER: Well, I think in advance of Mr. Boccuzzi's trial, he had violated his bond conditions; is that what --

MR. DURHAM: Your Honor, can I say something?

Before he stepped a foot on the boat, Mr. Reader told me that he was not going to call Mr. Singerman. He did say that your plea -- that Mr. Singerman's plea agreement with regards to Mr. Braun had the intended effect -- meaning he signed and then Mr. Braun signed, saving the Government about two months.

I think one word needs to be added to Mr. Reader's sentence about the Government's not filing a 5K. The word is "yet." But that is something that you can consider, his cooperation, as it relates to his sentencing today.

THE COURT: So let me ask you, Mr. Durham, then are you saying at the time Mr. Singerman signed the plea agreement on November the 10th, that he knew that he was going to be called as a witness against Mr. Braun?

MR. DURHAM: No, not at all. It was not until Your Honor after the -- so this is what happened. Mr. Singerman signs his plea agreement. Mr. Braun immediately folds after that and signs a plea agreement, because he was going to testify against him. In terms of the substantial assistance in the prosecution of another person, pretty much fits the definition, but it's up to the Government.

Now, with regards to Mr. Boccuzzi. After Mr. Singerman

pled guilty, he sat outside in this courtroom -- in this courtyard with the Government and went over specific text messages between him and Mr. Boccuzzi.

They made the calculated decision not to call Mr. Singerman because they didn't want to have the boss testifying against the little guy, and he told me that he wasn't going to call him well before he stepped a foot on the boat when he was drunk. It has nothing to do with it.

They made the calculated decision that we're not going to use Mr. Singerman in the Mr. Boccuzzi trial, because, again, they don't want the boss man testifying against an underling and that may not look good in front of a jury.

But as it represents to his cooperation against Mr. Braun, I mean, his plea agreement resulted in Mr. Braun's plea agreement and Blackstone Labs' plea agreement. But again, I believe that's an issue that may come up at a later time. That doesn't mean that Your Honor cannot consider that when fashioning a sentence; even though the Government hadn't filed a 5K motion.

THE COURT: When was the DUI on the boat?

MR. READER: I believe it was the day before Thanksgiving, Your Honor.

MR. DURHAM: November the 23rd. No, no, I think it was the Tuesday before Thanksgiving.

THE COURT: And the Boccuzzi trial started after that?

MR. READER: Correct.

MR. DURHAM: That's right, but we had already been --

THE COURT: So what you're saying, Mr. Durham, is that before the Boccuzzi trial occurred, before the DUI boating occurred, that the Government had already told you they weren't going to call Mr. Singerman because they didn't want to flip the boss against the smaller guy?

MR. DURHAM: Well, as a former federal prosecutor of 15 years, I'm adding the last part in terms of why they did not want to call Mr. Singerman.

But I can tell you this, they tried to get Mr. Boccuzzi to flip because they didn't wrote up the interview memo after his guilty plea and provided the text messages where they're literally talking about the sale of listed steroid products in those text messages.

They provided it to counsel for Mr. Boccuzzi; and Mr. Boccuzzi, for whatever reason, said I wanted my day in court. So it wasn't like they didn't try to use Mr. Singerman's cooperation against Mr. Boccuzzi. They just didn't want to call Mr. Singerman to the stand.

THE COURT: So let me ask you, what you're saying is before the DUI boating arrest occurred, the Government had told you, for whatever reason, that they weren't going to call Mr. Singerman in Mr. Boccuzzi's trial?

MR. DURHAM: That is correct.

MR. READER: If I could be heard on this?

THE COURT: Mr. Reader.

MR. READER: If I could be heard on this. I'm not suggesting for a second that Mr. Durham is misrepresenting what I said here, but I think that these discussions were a little more nuanced than are being represented here.

MR. DURHAM: "I'm not going to call you" is not nuanced, I can tell you that.

MR. READER: There was a lot of moving parts, Your Honor recalls at this time.

THE COURT: Before the DUI boating, did you tell Mr. Durham that you weren't going to call Mr. Singerman in the Boccuzzi trial?

MR. READER: I am sure that I told him that it was extremely unlikely, absolutely, yes.

THE COURT: All right. So there was nothing that Mr. Singerman did to disqualify himself from trying to accomplish substantial assistance with the Government at the point of the DUI boating arrest?

MR. READER: I'm sorry, you mean before or after the arrest?

THE COURT: Before the arrest, there was nothing that would have disqualified Mr. Singerman from being considered for substantial assistance in either Mr. Braun or Mr. Boccuzzi or the corporation's criminal prosecution?

MR. READER: Could I have just one moment?

THE COURT: Sure.

(Brief pause in the proceedings.)

MR. READER: Could I confer with Mr. Durham about this for very briefly?

THE COURT: Okay.

MR. READER: It won't take long.

(Brief pause in the proceedings.)

MR. DURHAM: Your Honor, can we have a sidebar?

MR. READER: Can we approach, Your Honor?

THE COURT: Maybe we don't need to do that.

Let me ask you this question.

Mr. Reader, do you agree that a defendant's attempt at substantial assistance is a mitigating circumstance that the Court can take into account in deciding whether a downward variance or a downward departure is appropriate?

MR. READER: Yes, I would agree with that, Your Honor.

THE COURT: Okay. So I'm going to consider the fact that on November 10th when Mr. Singerman pled guilty, signed the plea agreement, that contemplated substantial assistance, and that's a mitigating circumstance that the Court should take into account.

MR. READER: Very well.

Might I continue then, Your Honor?

THE COURT: Sure.

MR. READER: Yes. Your Honor, I had been speaking about Mr. Singerman's knowledge of the potential harm two individuals caused by these products. The Government has submitted under seal a series of statements from victims.

Several of these victims had intended or had interest in coming to court, Your Honor, but given the current flare-up in Covid, they choose to submit letters, and I'd like to represent just a little bit of their experience here to the Court.

Your Honor heard from victim C.H. in court and under cross-examination talking about --

THE COURT: Well, if he testified in court and if all this information came out in court, is it really necessary to seal his affidavit?

Or is it because the court testimony is going to be C.H., that that's why it needs to be sealed?

MR. READER: Well, Your Honor, there's a number of other individuals in here. I think it's a good, fair argument for Mr. C.H., but these other individuals' names and medical conditions have not been disclosed before.

THE COURT: Refresh my recollection --

MR. READER: Sure.

THE COURT: -- R.J., R.R. --

MR. READER: Yes.

THE COURT: I think it's L something B, were they named

in the indictment in any of the counts?

MR. READER: Some of those individuals were mentioned in the -- S.L. was mentioned in the indictment in the sense that her correspondence was a part of the indictment.

I don't believe -- victim L.V., which is the second letter in here, was not part of the indictment, in fact, the Government only made contact with this individual recently.

It was difficult to find current contact information for him. That's the individual who was the subject of the cholestatic jaundiced article that was part of the Government's submission.

The third letter is R.Y., which is a gentleman who experienced gynecomastia, breast tissue growth, that he associates with these products.

The fourth letter is R.R., who was -- Your Honor, there was a discussion about having him testify at trial, and the Government decided not to call him at trial.

And then S.L. I mentioned already.

Some are these are related to the indictment and some of them are not, Your Honor. Without spending a lot of time talking about C.H., who Your Honor has heard from, you know, obviously, the subject of the testimony was about causation and the jury made a decision about that. But what I want to share with the Court about this is really the impact on these victims.

THE COURT: Well, if we're going to talk about the impact of the victims, shouldn't the public record have what I'm relying on in considering that?

In other words, you're going to now talk about a summarized affidavits of individuals that have been sealed, and if the public wants to know what I saw they can't see it.

I mean, shouldn't these affidavits be part of the public record and maybe the names redacted towards initials or something like that, or maybe the Court shouldn't be considering them.

MR. READER: If Your Honor has a concern about considering these a part of the record, we can absolutely make a redacted version that eliminates, you know, personal identifying information about the victim.

THE COURT: Okay, why don't you do that. But go ahead.

MR. READER: So the point to make here is this, is that the impact of this scheme of the conspiracy on individuals and their lives was enormous. Beyond just the risks, beyond sort of physical harm was the impact that this had on their lives.

And as C.H. wrote in the letter here -- and again, I don't think this was necessarily the subject of his testimony, 'cause those were not questions the questions, but he said, the strain that this situation put on my family is now taking years to recover from, financially, physically, and mentally; my prayer is that no other family ever must endure this type of

hardship at the hands of companies who would not even respond to an e-mail from my wife.

THE COURT: Well, I mean, I remember C.H.'s testimony, and I don't think he was trying to get steroids that he couldn't be prescribed by a doctor. But my guess is a number of these individuals -- maybe not victims that you've submitted affidavits for -- you know, view this as a vehicle to get steroids or steroid-like substances without a doctor's prescription and they were willing to take the risks and some of them had adverse medical reactions to it.

MR. READER: I think that's perfectly fair, Your Honor, and that's why restitution in this case isn't returning every single dollar that was sold through these unlawful products. I think that's an absolutely fair characterization.

But out of -- you know, there were tens of thousands of dollars of steroids sold here and tens of thousands of bottles -- I'm sorry, ten of thousands of bottles of steroids and tens of thousands of bottles of other products.

You know, this is part of the factual proffer. There are synthetic stimulants and other products that were sold as a part of Blackstone. The trial may have focused on SARNs and steroids, but that was not the full extent of the conduct here. There were a wide range of chemicals put into products that were sold.

So the issue is, is out of the tens and tens of

thousands of bottles, what proportion is acceptable to society that we would unwittingly put at risk? I would argue, submit to the Court a very small proportion would be an acceptable risk.

And the examples here, these five people who've -- taken their time to share their personal stories and written to the Court about it is very meaningful. And these are not people who were in the situation where they thought, great, I could get a bottle of steroids on the internet and I'm not going to get arrested while doing a drug deal in a back alley.

I've spoken a little bit about this, Your Honor.

I think that the impact on these individuals and their families is significant. Mr. L.B. talked about the fear that he still has to the long-term damage to his liver after his hospitalization, how he could barely hold his own newborn because he was so sick, and how he wouldn't wish this experience on his worst enemy.

S.L., who is a local individual here, wrote to explain about her ER trip, the effects that she still feels today from this, the pain she felt; and R.R. wrote in his statement, after spending two months bedridden and missing seven weeks of work, I fell on tremendous financial hardship. Eventually, I was able to get back to work and slowly put my life back together. Unfortunately, there are things that I will never get back, for instance, like missing birthdays and holidays with my family,

these things can never be recovered or replaced.

So, with the benefit of all these, the need for deterrence, the need to punish this extraordinary conduct that lasted for years and affected an enormous number of people and was precisely the type of conduct that the law was intended to prohibit and needs to do so now, the Government would argue for a guideline sentence, Your Honor, and note that in addition to the forfeiture Mr. Singerman is able to pay a fine, there is a guideline range for the fine, although, it could be higher than that, the Government would recommend the high end of the guideline range for the fine, in addition to the forfeiture that's already been agreed to, as well as the restitution, Your Honor.

And I would note that there's at least one individual, who is R.Y., in the victim statements who is seeking funds for prospective medical care for surgery, to deal with the results of taking these Blackstone Labs' products.

THE COURT: Now is the time for me to decide restitution, I think R.Y. is asking for $5500, plus.

What's the defense position on my adding 5500 to the restitution, or was that already part of the $33,155?

MR. DURHAM: It's not part of it, Your Honor. I know the probation officer did not put that into her restitution calculation.

I told Mr. Reader before sentencing today that that

person could apply to get funds from the asset forfeiture funds. But if Your Honor believes that it should be added to the restitution amount, that's fine.

THE COURT: Anything further before I impose sentence?

MR. READER: No. Thank you, Your Honor.

THE COURT: Anything further?

MR. DURHAM: No, Your Honor.

THE COURT: Having considered the sentencing guidelines, having considered the factors in 18 United States, Code, Section 3553(a), it's up to the Court to determine what a reasonable and sufficient sentence is.

And the guideline range is 78 to 97 months, and that's persuasive but not controlling on the Court.

Part of the reason that the guideline range is 78 to 97 months is that Mr. Singerman's criminal history is a Category I. His history is a Category I because he has prior convictions that were not scorable that were stale.

He has the same criminal history Category I that someone would have if they never been arrested before. So the fact that he pled guilty to nine counts of possession with the intent to distribute controlled substances, and a burglary in 2000 and was placed on five years probation, to me, is an aggravating circumstance that the Court can consider in deciding whether the criminal history was underrepresented.

The fact that he left Blackstone Labs in April of 2016

and started REDCON1, which was a success, is a mitigating circumstance.

The fact that he's a good family man, has family support, has good community support is a mitigating circumstance.

His charity work, particularly regarding veterans, is a mitigating circumstance.

The fact that he's been a good employer and treats all of his employees appropriately and encourages them to better themselves is a mitigating circumstance.

The fact that other individuals have received lesser sentences is a mitigating circumstance, if the Court views those as disparate sentences.

And I realize that the United States Supreme Court has said that a judge can disagree with the guidelines and impose a downward departure or a downward variance because the judge disagrees with the guidelines.

And perhaps that's what most, if not all of these judges have done, is disagree with the guidelines. I don't disagree with the guidelines. Generally speaking, I think the guidelines are appropriate.

And if these types of sentences on these cases are disparate, then that's for the Guidelines Commission, if it's ever reconstituted, should look at to see whether or not the guidelines should be adjusted.

But I don't have any problem with the way the guidelines have been formulated as to these types of cases, and as to Mr. Singerman, I don't think that the fact that some judges feel that just giving someone the stigma of a felony conviction is enough punishment that that's going to deter individuals from committing crimes.

Sure, it's going to deter individuals, but not as much as long prison sentences would deter individuals.

So when I look at the aggravating and mitigating circumstances, it's up to the Court to determine what a fair and just sentence is.

The fact that he's paid the forfeiture is a mitigating circumstance; the fact that he's going to pay the restitution and has agreed to restitution, that may be, otherwise, I wouldn't have ordered this at the sentencing hearing is a mitigating circumstance.

The fact that he pled guilty is a mitigating circumstance, even though maybe it was a mistake staying out on bond, and maybe he would have been better off just surrendering himself and going into custody on November the 10th, but I consider it a mitigating circumstance.

The fact that he was willing to cooperate and has now subjected himself to criticism, to possible threats, to possible retaliation when he's in prison, when he gets out of prison, is a mitigating circumstance.

If the Court doesn't consider an individual's willingness to cooperate, if the Court just says, well, you know, the plea agreement said it's up to the sole and unreviewable judgment of the Government as to whether or not a substantial assistance motion is going to be filed, so, you know, you just take your chances and if the Government doesn't do it, unless their failure to do so is done on bad faith and on unconstitutional grounds, you're out of luck.

If the Court takes that position without also having the discretion to adjust the sentence for an attempted cooperation, then I think it can have a chilling effect on individuals deciding whether they're going to cooperate or not.

And I realize maybe in the future the Government will file a Rule 35 motion; and if they do, then the Court will address it at that time.

So when I weigh the aggravating and mitigating circumstances, it sounds to me -- it seems to me that a downward departure is appropriate, but not to the extent that Mr. Durham's requesting.

So it will be the judgment of Court and sentence of law that Mr. Singerman be sentenced to 54 months in prison on Count 4, 36 months in prison on Count 3, to run concurrent.

I place him on three years of supervised release as to Count 4, one year of supervised release as to Count 3, to run concurrent.

While on supervised release he shall not commit any crimes; he shall be prohibited from possessing a firearm, or other dangerous device; he shall not possess any controlled substances; he shall comply with the standard conditions of supervised release, including the special condition that he pay 2.9 million dollars in forfeiture, which I understand he's already paid.

I also find that he's able to pay a fine, and I impose a $25,000 fine. I impose a $200 special assessment, and I order that he pay $38,655.23, joint and several liability restitution.

If he works in a Unicore job -- if he hasn't already paid the restitution, if he works in a Unicore job while he's in prison, then he must pay 50 percent of his wages earned towards his financial obligations.

If he doesn't work in a Unicore job, then he must pay a minimum of $25 per quarter towards his financial obligations.

Upon his release from incarceration, he shall pay restitution if he hasn't already paid it, at the rate of 10 percent of his monthly gross earnings, until such time as the Court may alter that payment schedule.

I order that he get a drug and alcohol evaluation and successfully complete any treatment deemed necessary and contribute to the cost of the treatment based on an ability to pay.

I order that he provide complete access to his financial information to his probation officer. I order that he not own, operate or act as an employee, consultant in, or participate in any manner in the manufacture of dietary nutrition supplements during the period of the supervision.

I'll make an exception that he can be involved and have ownership in REDCON, LLC.

I order that he submit to a reasonable search of his person or property conducted in a reasonable time and manner by his probation officer.

I order that he not associate with any of the codefendants or coconspirators while on supervised release. I order that any unpaid amount of fine, restitution, or special assessment be paid during the period of the supervised release.

I recommend the RDAP program, realizing the recommendation is persuasive, not controlling, on the Bureau of Prisons, but I make it for whatever it's worth.

I recommend the Pensacola facility, realizing that recommendation is persuasive, not controlling, on the Bureau of Prisons, but I make it for whatever it's worth.

Mr. Singerman, it's my duty to inform you that you have 14 days within which to appeal the judgment and sentence of this Court. Should you desire to appeal and be without funds with which to prosecute an appeal, an attorney will be appointed to represent you in connection with that appeal.

Should you fail to appeal within that 14-day period, it will constitute a waiver of your right to appeal.

But my understanding is that there was an appeal waiver of this case; is that correct?

MR. DURHAM: Yes, Your Honor.

MR. READER: Yes, Your Honor.

THE COURT: Also, it's my duty to elicit from counsel for all parties fully articulated objections to the Court's findings of fact and conclusions of law, as announced at the sentencing hearing, to further elicit any objection which any party may have to the manner in which the sentence was imposed in this case?

Are there any objections from the Government?

MR. READER: No, Your Honor.

THE COURT: Mr. Durham?

MR. DURHAM: No, Your Honor.

THE COURT: All right, the Marshal will execute the sentence of the Court. You'll need to go with the Marshal now.

Good luck to you, Mr. Singerman.

And we'll take a 10-minute recess.

MR. READER: Your Honor, one final issue here. The Government -- can I make an oral motion to dismiss some counts here, or would you like something in writing?

THE COURT: No, no, I'll grant the motion to dismiss the other counts.

MR. READER: The other counts, yes, the Government would dismiss Counts 1, 2, 5, 9, 10, and 11, as to Mr. Singerman.

THE COURT: That motion's granted.

MR. READER: Thank you.

THE COURT: All right, we'll take a 10-minute recess.

COURTROOM DEPUTY: All rise.

(Proceedings concluded at 4:01 p.m.)

* * * * *

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

February 4th, 2022

S/Glenda M. Powers

GLENDA M. POWERS, RPR, CRR, FPR
United States District Court
400 North Miami Avenue
Miami, Florida 33128

## $

**$12** [1] - 11:6
**$200** [1] - 62:9
**$25** [1] - 62:17
**$25,000** [1] - 62:9
**$33,155** [1] - 57:21
**$33,155.23** [1] - 39:23
**$38,655.23** [1] - 62:10
**$500,000** [3] - 36:11, 36:19, 37:7
**$5500** [1] - 57:19

## 1

**1** [3] - 1:10, 3:16, 65:2
**10** [5] - 16:9, 17:5, 32:9, 62:19, 65:2
**10-minute** [3] - 11:24, 64:20, 65:6
**10th** [5] - 45:15, 45:17, 47:16, 51:19, 60:20
**11** [1] - 65:2
**14** [1] - 63:22
**14-day** [1] - 64:1
**15** [1] - 49:9
**18** [1] - 58:9
**19** [3] - 29:13, 30:2
**1990** [1] - 33:24
**1:30** [1] - 1:9
**1:52** [1] - 1:9

## 2

**2** [1] - 65:2
**2.9** [4] - 32:10, 34:17, 39:18, 62:6
**20** [3] - 23:12, 32:17, 38:16
**20-month** [3] - 34:11, 39:14, 40:8
**2000** [1] - 58:22
**2012** [3] - 21:10, 33:11, 42:25
**2013** [3] - 7:2, 7:12, 10:18
**2014** [1] - 43:10
**2015** [1] - 44:20
**2016** [11] - 16:16, 21:10, 23:25, 35:15, 35:17, 37:5, 39:11, 41:1, 41:8, 41:11, 58:25
**2017** [2] - 37:10, 42:25
**2018** [2] - 13:17, 13:22
**2020** [2] - 37:12, 37:14
**2021** [2] - 37:17, 37:18
**2022** [2] - 1:6, 65:16
**20530** [1] - 1:22
**218** [1] - 2:10
**22** [1] - 35:4
**23rd** [1] - 48:23
**24** [1] - 38:18
**250** [1] - 3:19
**27** [1] - 1:6
**28** [1] - 5:7
**2:28** [1] - 12:4
**2:38** [1] - 12:4

## 3

**3** [2] - 61:22, 61:24
**31401** [2] - 2:5, 2:10
**33128** [2] - 2:18, 65:20
**33401** [2] - 2:8, 2:13
**35** [2] - 41:11, 61:14
**3553** [3] - 6:2, 29:8, 29:9
**3553(a** [1] - 58:10
**36** [1] - 61:22

## 4

**4** [3] - 16:12, 61:22, 61:24
**400** [4] - 2:17, 31:2, 31:5, 65:19
**404(b** [1] - 37:13
**41** [2] - 30:25, 31:9
**42** [1] - 20:17
**450** [1] - 1:22
**4:01** [2] - 1:9, 65:8
**4th** [1] - 65:16

## 5

**5** [1] - 65:2
**50** [1] - 62:14
**501(c)(3** [1] - 13:10
**54** [1] - 61:21
**5500** [1] - 57:20
**5K** [2] - 47:11, 48:19

## 6

**6** [1] - 16:12
**60** [2] - 31:8, 36:12

## 7

**7** [1] - 2:4
**703** [1] - 2:5
**707** [2] - 2:7, 2:12
**77** [1] - 1:10
**78** [3] - 5:8, 58:12, 58:14

## 9

**9** [2] - 16:12, 65:2
**97** [3] - 5:8, 58:12, 58:15
**9:19-CR-80030-WPD** [1] - 1:2

## A

**a)(6** [1] - 29:9
**Aaron** [32] - 6:25, 7:3, 7:21, 8:6, 9:5, 9:17, 10:16, 11:8, 13:18, 15:6, 15:10, 16:8, 16:11, 17:19, 17:21, 18:23, 19:4, 19:5, 19:16, 20:6, 20:8, 20:9, 20:17, 20:22, 35:8, 36:10, 36:24, 37:14, 37:17, 39:10, 40:12
**aaron** [1] - 20:1
**AARON** [1] - 1:8
**Aaron's** [4] - 8:11, 14:2, 14:25, 18:21
**ability** [2] - 19:24, 62:24
**able** [6] - 23:8, 23:13, 42:21, 56:23, 57:8, 62:8
**above-entitled** [1] - 65:14
**absolutely** [10] - 14:23, 15:8, 28:14, 36:17, 39:2, 39:12, 42:24, 50:15, 54:12, 55:14
**abuse** [5] - 15:21, 15:22, 17:22, 18:3, 40:16
**abusing** [1] - 17:24
**accept** [1] - 29:1
**acceptable** [2] - 56:1, 56:3
**acceptance** [7] - 3:25, 4:4, 4:5, 4:8, 4:11, 4:14, 5:2
**access** [1] - 63:1
**accessible** [1] - 43:14
**accommodation** [1] - 13:2
**accommodations** [1] - 13:1
**accomplish** [1] - 50:18
**account** [2] - 51:15, 51:22
**accountability** [1] - 31:22
**accounts** [1] - 33:18
**accurate** [1] - 65:13
**Act** [1] - 44:12
**act** [1] - 63:3
**action** [2] - 13:3, 21:25
**actions** [6] - 10:11, 17:14, 19:6, 27:13, 27:16
**active** [1] - 24:15
**activity** [4] - 36:5, 36:15, 41:13, 41:21
**added** [2] - 47:10, 58:2
**addiction** [4] - 3:9, 3:10, 28:3
**adding** [2] - 49:9, 57:20
**addition** [5] - 19:17, 39:22, 39:25, 57:7, 57:11
**additional** [2] - 14:17, 40:13
**address** [2] - 40:24, 61:15
**adjust** [1] - 61:10
**adjusted** [1] - 59:25
**admission** [1] - 28:8
**admitted** [3] - 41:6, 42:9, 44:18
**advance** [1] - 47:1
**advantage** [1] - 8:19
**adverse** [1] - 55:10
**advertisements** [1] - 42:6
**affect** [1] - 28:2
**affected** [1] - 57:4
**affidavit** [1] - 52:14
**affidavits** [3] - 54:5, 54:7, 55:7
**afford** [1] - 11:3
**Afghanistan** [1] - 12:24
**afterwards** [2] - 11:22, 39:11
**agency** [1] - 35:20
**agent** [1] - 3:15
**ages** [1] - 16:12
**aggravating** [3] - 58:23, 60:9, 61:16
**ago** [4] - 18:6, 27:14, 28:17, 35:8
**agree** [2] - 51:13, 51:17
**agreed** [5] - 4:19, 34:16, 38:16, 57:12, 60:14
**agreement** [17] - 4:6, 38:13, 38:19, 45:14, 45:17, 46:7, 46:14, 47:6, 47:15, 47:20, 47:21, 48:14, 48:15, 51:20, 61:3
**ahead** [2] - 29:6, 54:15
**Aiden** [3] - 16:14, 22:15, 22:25
**air** [2] - 34:12, 39:15
**Air** [1] - 13:13
**alcohol** [2] - 18:2, 62:22
**aliases** [1] - 33:17
**Alijah** [1] - 16:14
**ALISTAIR** [1] - 1:20
**alley** [1] - 56:10
**allowed** [2] - 4:24, 40:17
**allowing** [1] - 6:24
**almost** [1] - 21:25
**alongside** [1] - 19:22
**alter** [1] - 62:21
**Amazon** [1] - 25:16
**Ambien** [1] - 5:17
**AMERICA** [1] - 1:5
**amount** [7] - 17:3, 18:25, 39:22, 40:1, 40:2, 58:3, 63:13
**AMY** [1] - 2:11
**Anabolic** [1] - 44:12
**anabolic** [5] - 29:11, 29:25, 32:6, 34:13, 44:22
**analogy** [1] - 9:20
**anger** [1] - 18:14
**announced** [1] - 64:9
**Anthony** [1] - 23:15
**anxiety** [2] - 26:17, 27:7
**anxious** [1] - 9:13
**apologize** [2] - 21:17, 21:20
**appeal** [7] - 63:22, 63:23, 63:24, 63:25, 64:1, 64:2, 64:3
**APPEARANCES** [2] - 1:18, 2:1
**apply** [2] - 39:19, 58:1
**appointed** [1] - 63:25
**appreciate** [3] - 16:2, 20:4, 20:25
**appreciates** [2] - 11:18, 14:14
**approach** [1] - 51:10
**approached** [2] - 12:10, 16:6
**appropriate** [5] - 5:5, 44:6, 51:16, 59:21, 61:18
**appropriately** [1] - 59:9
**approval** [1] - 23:22
**approved** [2] - 21:19, 42:10

**April** [2] - 39:11, 58:25
**AR-15** [1] - 33:22
**area** [1] - 42:16
**Arele** [1] - 6:15
**argue** [3] - 44:24, 56:2, 57:6
**arguing** [1] - 45:10
**argument** [3] - 6:1, 29:5, 52:18
**Army** [1] - 13:12
**arrest** [7] - 4:25, 5:12, 5:19, 49:22, 50:19, 50:21, 50:22
**arrested** [7] - 4:21, 4:23, 4:25, 5:18, 34:5, 56:10, 58:19
**article** [2] - 43:15, 53:10
**articulated** [1] - 64:8
**ashamed** [1] - 27:17
**Ashen** [1] - 16:14
**aspect** [2] - 16:23, 23:10
**assessment** [2] - 62:9, 63:14
**asset** [1] - 58:1
**assistance** [9] - 45:18, 45:19, 45:23, 47:23, 50:18, 50:24, 51:14, 51:20, 61:5
**associate** [1] - 63:11
**associated** [1] - 31:3
**associates** [1] - 53:14
**assuming** [1] - 6:9
**attempt** [1] - 51:13
**attempted** [1] - 61:10
**attending** [1] - 7:19
**attention** [1] - 21:21
**attorney** [1] - 63:24
**attribute** [1] - 19:24
**authentic** [1] - 8:7
**Avenue** [2] - 2:17, 65:19
**avoid** [4] - 21:21, 29:10, 31:14, 45:9
**avoiding** [1] - 34:23
**avoids** [1] - 40:10
**awaiting** [1] - 46:8
**award** [1] - 3:24
**awards** [1] - 12:25
**aware** [4] - 14:16, 17:21, 41:3, 43:16

## B

**backbone** [1] - 41:7
**background** [1] - 12:16
**bad** [2] - 27:5, 61:7
**bank** [1] - 33:17
**bankruptcy** [1] - 10:22
**banned** [1] - 33:24
**barely** [1] - 56:15
**base** [1] - 23:10
**based** [2] - 9:10, 62:24
**basement** [1] - 33:18
**bases** [2] - 25:15, 25:16
**basis** [2] - 8:24, 41:7
**Beach** [2] - 2:8, 2:13
**became** [1] - 43:1
**become** [2] - 9:15, 10:19
**becoming** [1] - 37:15
**bedridden** [1] - 56:21
**BEFORE** [1] - 1:15
**beginning** [1] - 23:21
**begins** [1] - 37:6
**behalf** [1] - 6:25
**behavior** [1] - 44:15
**believes** [2] - 25:11, 58:2
**benefit** [1] - 57:2
**best** [3] - 22:11, 35:18, 42:7
**better** [7] - 9:15, 10:2, 10:19, 15:15, 36:16, 59:9, 60:19
**between** [5] - 4:21, 9:12, 19:7, 39:10, 48:3
**beyond** [6] - 19:21, 19:23, 28:9, 41:5, 54:18
**big** [5] - 25:9, 26:4, 26:8, 42:24, 43:22
**biggest** [2] - 32:4, 32:15
**Birthday** [1] - 20:22
**birthdays** [1] - 56:25
**bit** [3] - 18:5, 52:8, 56:11
**Blackstone** [34] - 16:16, 16:21, 17:11, 21:9, 21:11, 22:2, 22:7, 22:16, 28:13, 28:18, 32:3, 32:6, 32:7, 32:9, 32:13, 36:2, 36:10, 37:1, 37:4, 37:6, 37:8, 37:18, 39:10, 39:19, 40:25, 41:18, 42:2, 43:11, 46:20, 46:22, 48:15, 55:21, 57:17, 58:25
**Blackstone's** [2] - 41:7, 42:13
**Blackstones** [2] - 32:8, 32:14
**board** [1] - 31:15
**boat** [3] - 47:4, 48:8, 48:20
**boating** [4] - 49:4, 49:22, 50:11, 50:19
**Boca** [2] - 7:1, 7:2
**Boccuzzi** [17] - 37:8, 41:17, 46:4, 46:5, 46:19, 46:22, 47:25, 48:3, 48:10, 48:25, 49:4, 49:11, 49:16, 49:17, 49:19, 50:13, 50:24
**Boccuzzi's** [2] - 47:1, 49:24
**body** [1] - 42:12
**bolted** [1] - 34:5
**bond** [5] - 18:21, 27:19, 27:24, 47:2, 60:19
**booted** [1] - 37:5
**boss** [3] - 48:5, 48:11, 49:7
**bothered** [1] - 11:2
**bottle** [1] - 56:9
**bottles** [4] - 55:16, 55:17, 55:18, 56:1
**bought** [1] - 42:16
**boxes** [1] - 11:6
**boy** [2] - 19:15, 20:3
**boys** [7] - 15:11, 15:14, 16:12, 20:9, 22:24, 25:17, 26:10
**bragging** [1] - 42:7
**branches** [1] - 24:15
**brand** [2] - 25:14, 25:18
**Braun** [16] - 37:10, 37:12, 37:13, 37:22, 38:9, 38:19, 38:22, 41:20, 46:7, 46:15, 47:7, 47:8, 47:17, 47:20, 48:14, 50:24
**Braun's** [4] - 4:17, 38:23, 46:10, 48:14
**brazen** [1] - 42:19
**break** [2] - 15:24, 27:10
**breaking** [1] - 4:10
**breast** [1] - 53:13
**BRIAN** [1] - 2:3
**Brief** [2] - 51:3, 51:8
**brief** [1] - 3:3
**briefly** [1] - 51:5
**broad** [1] - 42:5
**broke** [1] - 27:24
**broken** [1] - 38:3
**bronze** [1] - 13:3
**brought** [2] - 26:13, 31:13
**buddies** [1] - 39:3
**build** [1] - 23:8
**builders** [1] - 42:12
**building** [1] - 37:14
**built** [2] - 41:13
**Bureau** [3] - 40:17, 63:17, 63:20
**burglary** [1] - 58:21
**business** [10] - 11:11, 12:17, 15:5, 17:7, 17:9, 17:17, 23:17, 23:18, 32:10, 32:20
**business'** [1] - 23:5
**businessman** [4] - 16:24, 21:14, 36:6, 36:7
**bust** [1] - 38:6
**butterfly** [1] - 3:6
**buys** [1] - 36:4
**BY** [1] - 2:16
**bylaws** [1] - 21:21

## C

**C.H** [5] - 52:10, 52:16, 52:19, 53:21, 54:20
**C.H.'s** [1] - 55:3
**calculated** [2] - 48:4, 48:9
**calculating** [1] - 5:6
**calculation** [2] - 5:9, 57:24
**cancer** [2] - 19:14, 19:16
**cannot** [3] - 45:5, 48:17
**car** [3] - 5:17, 22:19, 36:4
**care** [2] - 20:1, 57:16
**cars** [2] - 11:9, 11:10
**CASE** [1] - 1:2
**case** [39] - 3:15, 10:16, 29:10, 29:14, 29:17, 29:23, 31:1, 31:3, 31:4, 31:5, 31:7, 31:10, 31:12, 32:1, 32:2, 32:3, 32:20, 32:24, 33:1, 33:10, 33:20, 34:22, 35:25, 36:3, 38:7, 39:16, 40:9, 43:10, 43:18, 43:20, 43:24, 44:10, 44:25, 55:12, 64:4, 64:12
**cases** [16] - 29:13, 29:20, 29:24, 30:2, 30:4, 31:13, 31:16, 31:18, 32:22, 32:25, 33:3, 33:14, 34:15, 34:24, 59:22, 60:2
**cashing** [1] - 41:10
**category** [1] - 29:15
**Category** [4] - 5:8, 58:16, 58:18
**caught** [1] - 34:6
**causation** [1] - 53:22
**caused** [2] - 27:6, 52:3
**causing** [1] - 45:3
**celebration** [1] - 20:20
**certainly** [1] - 41:10
**Certificate** [1] - 37:12
**certificates** [1] - 37:9
**certifications** [1] - 24:4
**certified** [1] - 24:1
**certify** [1] - 65:12
**cetera** [1] - 9:13
**CFO** [1] - 23:14
**Chabad** [1] - 7:1
**chance** [1] - 17:15
**chances** [1] - 61:6
**change** [11] - 3:8, 3:10, 4:18, 10:19, 23:9, 24:9, 25:3, 28:17, 35:17, 39:13, 40:6
**changed** [3] - 10:17, 19:6, 44:20
**Chanukah** [1] - 7:22
**chaos** [1] - 3:6
**characteristics** [2] - 35:3, 35:16
**characterization** [5] - 36:1, 36:22, 46:10, 46:12, 55:14
**charged** [2] - 4:16, 31:23
**charitable** [2] - 12:14, 13:11
**charities** [2] - 14:18, 24:18
**charity** [1] - 59:6
**check** [2] - 10:13, 40:2
**checks** [1] - 41:10
**chemicals** [1] - 55:23
**chief** [4] - 23:6, 23:11, 23:14, 23:20
**child** [3] - 19:13, 22:14, 27:9
**children** [5] - 10:24, 15:13, 16:10, 17:1, 28:24
**chilling** [1] - 61:11
**China** [2] - 32:12, 34:1
**choice** [1] - 9:24
**cholestatic** [1] - 53:10
**choose** [2] - 10:1, 52:7
**Circuit** [1] - 4:13
**circumstance** [13] -

51:14, 51:21, 58:23, 59:2, 59:5, 59:7, 59:10, 59:12, 60:13, 60:16, 60:18, 60:21, 60:25
**circumstances** [5] - 35:2, 39:13, 40:11, 60:10, 61:17
**cite** [1] - 33:16
**cited** [1] - 31:2
**cites** [1] - 33:17
**claiming** [1] - 42:9
**Clarkson** [1] - 2:4
**clear** [3] - 34:24, 38:4, 38:17
**clergy** [1] - 8:14
**clip** [1] - 3:5
**close** [5] - 33:6, 34:2, 34:8, 35:13, 40:20
**co** [3] - 33:25, 41:17, 41:19
**co-conspirators** [2] - 33:25, 41:19
**co-defendant** [1] - 41:17
**cocaine** [1] - 3:9
**coconspirators** [1] - 63:12
**code** [3] - 38:3, 39:7
**Code** [1] - 58:10
**codefendants** [2] - 43:7, 63:12
**collect** [1] - 44:4
**colloquy** [1] - 4:7
**Columbia** [1] - 12:18
**combat** [2] - 13:3, 25:6
**comfortable** [1] - 6:17
**coming** [1] - 52:6
**Commission** [1] - 59:23
**commit** [1] - 62:1
**commits** [1] - 4:14
**committed** [1] - 4:8
**committing** [1] - 60:6
**common** [1] - 30:19
**community** [2] - 28:24, 59:4
**companies** [2] - 24:3, 55:1
**company** [18] - 22:2, 22:6, 22:23, 23:3, 24:8, 25:13, 28:19, 35:19, 37:7, 41:2, 41:4, 41:10, 41:12, 41:25, 42:25, 43:17, 44:3, 45:1
**competitors** [1] - 24:11
**complaint** [1] - 23:14
**complete** [4] - 22:5, 36:15, 62:23, 63:1
**completely** [2] - 3:17, 3:18
**compliance** [2] - 23:15, 25:20
**compliancy** [1] - 24:5
**compliant** [2] - 23:10, 23:24
**comply** [1] - 62:4
**concern** [2] - 44:13, 54:11
**concluded** [2] - 3:2, 65:8
**conclusions** [1] - 64:9
**concurrent** [2] - 61:22, 61:25
**condition** [1] - 62:5
**conditions** [4] - 4:20, 47:2, 52:20, 62:4
**conduct** [13] - 31:20, 40:5, 42:1, 43:2, 43:6, 43:24, 44:8, 44:11, 45:4, 55:22, 57:3, 57:5
**conducted** [1] - 63:9
**confer** [1] - 51:4
**confirmed** [1] - 4:6
**conflicts** [1] - 12:20
**congregants** [3] - 7:4, 7:6, 7:7
**Congress** [2] - 2:4, 44:12
**connection** [1] - 63:25
**Connors** [1] - 23:15
**conquered** [1] - 28:4
**consequences** [2] - 27:12, 45:6
**consider** [9] - 13:23, 15:5, 29:9, 47:12, 48:17, 51:18, 58:23, 60:21, 61:1
**considered** [4] - 5:4, 50:23, 58:8, 58:9
**considering** [3] - 54:3, 54:10, 54:12
**considers** [1] - 11:8
**conspiracies** [1] - 41:18
**conspiracy** [1] - 54:17
**conspirators** [2] - 33:25, 41:19
**constant** [1] - 17:18
**constitute** [1] - 64:2
**consultant** [1] - 63:3
**consultations** [1] - 45:24
**consumer** [1] - 25:19
**consumers** [4] - 21:17, 28:12, 43:3, 45:3
**contact** [2] - 53:7, 53:8
**contemplated** [2] - 45:18, 51:20
**context** [1] - 10:1
**continue** [5] - 11:22, 17:24, 26:9, 28:22, 51:24
**continued** [2] - 41:11, 44:4
**CONTINUED** [1] - 2:1
**continues** [1] - 20:3
**continuing** [2] - 41:13, 42:25
**continuous** [1] - 19:17
**contribute** [1] - 62:24
**Control** [1] - 44:12
**control** [1] - 41:1
**controlled** [3] - 28:11, 58:21, 62:3
**controlling** [3] - 58:13, 63:16, 63:19
**conversation** [1] - 9:9
**conversations** [3] - 14:21, 29:16, 29:19
**convicted** [1] - 33:19
**conviction** [1] - 60:5
**convictions** [1] - 58:17
**convince** [1] - 37:3
**cooperate** [7] - 32:21, 38:16, 46:2, 60:22, 61:2, 61:12
**cooperated** [1] - 39:7
**cooperation** [6] - 38:23, 39:1, 47:13, 48:13, 49:19, 61:11
**copycat** [1] - 22:2
**corporate** [3] - 31:19, 31:20
**corporation's** [1] - 50:25
**Corps** [1] - 13:13
**correct** [12] - 5:9, 16:16, 39:23, 39:24, 40:24, 42:4, 46:9, 46:11, 46:23, 49:1, 49:25, 64:4
**correspondence** [1] - 53:4
**cost** [1] - 62:24
**counsel** [5] - 12:6, 15:21, 44:17, 49:16, 64:7
**Count** [4] - 61:22, 61:24
**countries** [1] - 25:17
**country** [14] - 3:19, 3:20, 25:15, 26:6, 29:13, 30:2, 31:14, 31:24, 32:15, 32:22, 32:25, 33:15, 34:14, 34:25
**counts** [5] - 53:1, 58:20, 64:22, 64:25, 65:1
**Counts** [1] - 65:2
**course** [2] - 8:13, 23:12
**Court** [38] - 2:16, 2:17, 5:4, 7:15, 8:8, 18:3, 19:19, 20:19, 21:22, 27:14, 27:17, 27:23, 28:7, 28:25, 44:7, 46:1, 51:15, 51:21, 52:9, 53:24, 54:9, 56:3, 56:7, 58:10, 58:13, 58:23, 59:12, 59:14, 60:10, 61:1, 61:2, 61:9, 61:14, 61:20, 62:21, 63:23, 64:18, 65:19
**court** [7] - 35:12, 49:18, 52:6, 52:10, 52:12, 52:13, 52:15
**COURT** [70] - 1:1, 4:2, 5:13, 5:19, 5:21, 5:24, 6:3, 6:6, 6:11, 6:14, 6:16, 6:19, 11:18, 11:24, 12:2, 12:5, 16:2, 20:25, 21:3, 21:6, 29:4, 29:6, 30:3, 30:7, 30:10, 30:15, 30:23, 37:22, 37:25, 38:21, 39:21, 40:21, 45:13, 45:17, 46:6, 46:13, 46:17, 46:21, 46:24, 47:14, 48:20, 48:25, 49:3, 49:21, 50:2, 50:11, 50:16, 50:22, 51:2, 51:6, 51:11, 51:18, 51:25, 52:12, 52:21, 52:23, 52:25, 54:1, 54:15, 55:3, 57:18, 58:4, 58:6, 58:8, 64:7, 64:15, 64:17, 64:24, 65:4, 65:6
**Court's** [1] - 64:8
**COURTROOM** [2] - 12:3, 65:7
**courtroom** [1] - 48:1
**courts** [1] - 4:13
**courtyard** [1] - 48:2
**COVID** [3] - 24:21, 24:22, 24:23
**Covid** [1] - 52:7
**create** [1] - 23:8
**created** [1] - 22:11
**creating** [1] - 23:18
**credit** [1] - 44:19
**cried** [1] - 27:9
**crime** [3] - 4:15, 4:16
**crimes** [7] - 3:5, 28:8, 28:15, 31:24, 45:12, 60:6, 62:2
**Criminal** [1] - 5:8
**criminal** [10] - 33:13, 36:5, 36:14, 40:4, 41:13, 41:21, 50:25, 58:15, 58:18, 58:24
**criminality** [1] - 35:19
**criticism** [1] - 60:23
**cross** [1] - 52:11
**cross-examination** [1] - 52:11
**CRR** [2] - 2:16, 65:18
**cupcakes** [1] - 20:21
**current** [2] - 52:6, 53:8
**custody** [1] - 60:20
**customer** [4] - 23:10, 25:8, 25:11
**customers** [3] - 10:22, 41:22, 42:15
**cut** [2] - 40:2, 41:11

## D

**D.C** [1] - 1:22
**dad** [1] - 26:21
**daddy** [1] - 26:18
**daddy's** [3] - 26:18, 26:23, 26:24
**daily** [1] - 20:3
**damage** [1] - 56:14
**dangerous** [5] - 43:2, 43:4, 43:7, 62:3
**Darielle** [8] - 15:12, 16:5, 16:7, 20:23, 22:14, 22:16, 26:9, 26:15
**DARIELLE** [1] - 16:6
**dark** [1] - 33:17
**DASCA** [1] - 33:12
**day-to-day** [1] - 23:5
**daylight** [1] - 42:5
**days** [5] - 21:10, 31:17, 31:19, 36:12, 63:22
**de** [1] - 39:1
**de-rail** [1] - 39:1
**deal** [4] - 26:2, 26:4, 56:10, 57:16
**dealer** [1] - 36:3
**dealing** [2] - 15:22, 33:4
**dear** [1] - 14:23
**deaths** [2] - 31:3, 31:6

**debate** [2] - 44:6, 44:16
**December** [1] - 4:2
**decide** [2] - 29:1, 57:18
**decided** [1] - 53:17
**deciding** [4] - 5:5, 51:15, 58:24, 61:12
**decision** [8] - 22:12, 28:17, 28:19, 35:6, 45:24, 48:4, 48:9, 53:23
**decisions** [1] - 28:2
**deemed** [1] - 62:23
**defendant** [13] - 4:14, 7:8, 12:9, 31:5, 35:3, 35:16, 40:4, 40:9, 40:12, 41:5, 41:17, 44:18, 45:7
**DEFENDANT** [6] - 1:10, 2:3, 6:8, 6:12, 21:4, 21:7
**defendant's** [2] - 16:4, 51:13
**defendants** [2] - 44:25, 45:4
**defense** [2] - 6:15, 57:20
**definition** [1] - 47:24
**degree** [1] - 12:17
**deliberating** [1] - 11:25
**delivering** [1] - 32:13
**demon** [1] - 28:3
**demonstrate** [1] - 27:15
**denominator** [1] - 30:19
**deny** [1] - 4:14
**Department** [1] - 1:21
**departure** [3] - 51:16, 59:16, 61:18
**deploy** [1] - 12:20
**deployed** [1] - 12:23
**depressed** [1] - 9:13
**DEPUTY** [2] - 12:3, 65:7
**describe** [2] - 8:8, 15:2
**described** [2] - 15:24, 29:16
**deserve** [1] - 5:2
**designed** [1] - 44:14
**Designer** [1] - 44:12
**desire** [2] - 16:25, 63:23
**deter** [3] - 60:5, 60:7, 60:8
**determine** [2] - 58:10, 60:10
**deterrence** [7] - 30:18, 34:18, 34:22, 40:10, 44:5, 44:24, 57:3
**developed** [2] - 7:16, 7:24
**device** [1] - 62:3
**diagnosed** [1] - 19:16
**dietary** [7] - 28:12, 29:11, 29:25, 34:13, 42:23, 44:14, 63:4
**difference** [4] - 21:24, 25:1, 38:10, 38:11
**different** [6] - 3:20, 4:15, 17:12, 24:5, 39:12
**difficult** [3] - 26:21, 27:6, 53:8
**DiMaggio** [2] - 43:9, 43:15
**dime** [1] - 36:10
**DIMITROULEAS** [1] - 1:15
**directly** [1] - 19:4
**disagree** [3] - 59:15, 59:19, 59:20
**disagrees** [1] - 59:17
**disclosed** [1] - 52:20
**discretion** [3] - 3:24, 5:2, 61:10
**discuss** [1] - 18:10
**discussed** [2] - 9:21, 43:17
**discusses** [1] - 10:5
**discussing** [2] - 9:11, 10:7
**discussion** [1] - 53:16
**discussions** [2] - 45:24, 50:5
**dismiss** [3] - 64:22, 64:24, 65:2
**disparate** [3] - 45:10, 59:13, 59:23
**disparities** [3] - 29:10, 31:15, 40:11
**dispute** [1] - 22:8
**disputing** [1] - 43:5
**disqualified** [1] - 50:23
**disqualifies** [1] - 4:3
**disqualify** [1] - 50:17
**distribute** [2] - 42:21, 58:21
**distributed** [1] - 32:6
**distributing** [1] - 34:4
**District** [6] - 2:17, 29:21, 30:5, 30:24, 32:18, 65:19
**district** [1] - 4:13
**DISTRICT** [3] - 1:1, 1:1, 1:15
**DMZ** [1] - 43:11
**doctor** [1] - 55:5
**doctor's** [1] - 55:8
**doctors** [1] - 43:13
**documents** [1] - 46:5
**dollar** [2] - 39:18, 55:13
**dollars** [9] - 24:18, 31:2, 31:5, 32:10, 34:17, 41:20, 42:22, 55:16, 62:6
**donations** [3] - 19:17, 19:23, 24:18
**done** [12] - 8:3, 9:12, 9:23, 10:1, 10:4, 11:1, 18:15, 19:6, 24:17, 39:6, 59:19, 61:7
**donor** [1] - 14:14
**Dopin** [1] - 6:15
**doses** [4] - 32:6, 32:16, 45:2
**down** [2] - 3:22, 32:13
**downward** [6] - 30:11, 51:15, 51:16, 59:16, 61:18
**dozens** [2] - 7:7, 32:14
**Dr** [1] - 37:8
**dress** [1] - 25:25
**drinking** [2] - 18:5, 18:11
**Drive** [2] - 2:7, 2:12
**driven** [2] - 24:8
**drug** [5] - 33:4, 36:3, 42:4, 56:10, 62:22
**drugs** [1] - 17:24
**drunk** [1] - 48:8
**due** [3] - 24:21, 24:22, 25:6
**DUI** [5] - 48:20, 49:4, 49:22, 50:11, 50:19
**DURHAM** [97] - 2:3, 3:3, 5:10, 5:15, 5:20, 5:23, 6:1, 6:5, 6:13, 6:15, 6:18, 6:21, 7:4, 7:8, 7:11, 7:13, 7:15, 8:4, 9:2, 11:16, 12:1, 12:8, 12:11, 12:16, 12:19, 12:22, 12:25, 13:4, 13:6, 13:9, 13:14, 13:16, 13:18, 13:20, 13:23, 13:25, 14:9, 14:12, 14:16, 14:20, 14:24, 15:2, 15:6, 15:9, 15:16, 16:1, 16:4, 16:7, 16:10, 16:13, 16:15, 16:18, 16:21, 17:1, 17:9, 17:21, 17:24, 18:2, 18:10, 18:18, 18:21, 19:2, 19:8, 19:11, 19:13, 19:19, 20:5, 20:8, 20:12, 20:15, 20:17, 20:19, 20:23, 21:1, 29:5, 29:7, 30:6, 30:9, 30:14, 30:21, 31:1, 37:24, 38:1, 38:25, 39:24, 47:3, 47:18, 48:23, 49:2, 49:8, 49:25, 50:7, 51:9, 57:22, 58:7, 64:5, 64:16
**Durham** [9] - 2:4, 12:7, 32:24, 47:14, 49:3, 50:4, 50:12, 51:4, 64:15
**Durham's** [1] - 61:19
**during** [3] - 4:6, 63:5, 63:14
**duty** [3] - 24:15, 63:21, 64:7

## E

**e-mail** [2] - 43:9, 55:2
**e-mails** [1] - 18:25
**early** [2] - 31:17, 31:19
**earned** [2] - 41:20, 62:14
**earnings** [1] - 62:20
**East** [1] - 2:4
**easy** [5] - 22:1, 22:4, 24:10, 26:3
**edge** [1] - 21:12
**Eduardo** [1] - 23:6
**educate** [1] - 10:3
**education** [1] - 12:18
**educational** [1] - 12:16
**effect** [3] - 3:6, 47:7, 61:11
**effects** [1] - 56:19
**efficacious** [2] - 24:6, 25:7
**efficacy** [1] - 25:8
**eight** [1] - 30:7
**Eighth** [1] - 31:21
**either** [1] - 50:24
**Eleventh** [1] - 4:13
**elicit** [2] - 64:7, 64:10
**eliminates** [1] - 54:13
**embarrassed** [3] - 22:17, 22:20, 23:1
**employee** [1] - 63:3
**employees** [2] - 8:16, 59:9
**employer** [1] - 59:8
**employing** [1] - 3:19
**encourages** [1] - 59:9
**encrypted** [1] - 33:17
**end** [9] - 4:18, 11:11, 11:12, 11:13, 22:9, 39:11, 57:10
**endangers** [1] - 44:8
**ended** [2] - 23:2, 24:25
**ends** [1] - 10:11
**endure** [1] - 54:25
**enemy** [1] - 56:17
**enforcement** [1] - 14:5
**enforcement's** [1] - 43:1
**engaging** [1] - 41:4
**enjoys** [1] - 14:14
**enormous** [3] - 45:3, 54:18, 57:4
**entire** [3] - 3:5, 26:16, 40:2
**entitled** [2] - 5:1, 65:14
**equal** [1] - 8:19
**ER** [1] - 56:19
**Eric** [3] - 23:4, 23:12, 23:25
**especially** [1] - 9:6
**ESQ** [7] - 1:20, 1:20, 2:3, 2:3, 2:6, 2:9, 2:11
**et** [1] - 9:13
**evaluation** [1] - 62:22
**event** [1] - 4:3
**eventually** [1] - 56:22
**evidence** [3] - 41:3, 43:6, 44:18
**exact** [1] - 9:9
**exaggeration** [3] - 8:1, 8:12, 8:15
**examination** [1] - 52:11
**example** [4] - 10:20, 17:16, 19:8, 33:15
**examples** [2] - 15:9, 56:5
**exception** [1] - 63:6
**EXCERPT** [1] - 1:13
**excited** [1] - 23:23
**excuse** [1] - 26:20
**excuses** [2] - 21:13, 21:14
**execute** [1] - 64:17
**executed** [1] - 41:18
**executive** [1] - 12:18
**executives** [1] - 24:4
**exhibit** [1] - 43:8
**exist** [1] - 3:18
**existence** [1] - 13:16
**exists** [1] - 30:13
**experience** [3] -

23:13, 52:8, 56:17
**experienced** [2] - 27:25, 53:13
**expertise** [1] - 42:16
**explain** [2] - 26:21, 56:18
**expressed** [1] - 14:22
**expressing** [1] - 19:3
**extent** [4] - 25:11, 40:18, 55:22, 61:18
**extraordinary** [2] - 40:4, 57:3
**extreme** [1] - 9:18
**extremely** [4] - 9:20, 25:23, 50:15

## F

**Face** [1] - 8:3
**Facebook** [1] - 42:6
**faced** [1] - 32:24
**facility** [1] - 63:18
**fact** [21] - 5:3, 10:8, 10:14, 11:5, 22:10, 30:13, 30:17, 43:24, 51:18, 53:6, 58:20, 58:25, 59:3, 59:8, 59:11, 60:3, 60:12, 60:13, 60:17, 60:22, 64:9
**factor** [2] - 5:4, 39:17
**factors** [3] - 6:2, 29:8, 58:9
**factual** [4] - 40:23, 41:6, 41:15, 55:19
**fail** [1] - 64:1
**failure** [1] - 61:7
**fair** [6] - 26:25, 46:10, 52:18, 55:11, 55:14, 60:10
**faith** [1] - 61:7
**falling** [1] - 3:22
**fallout** [1] - 28:1
**falls** [1] - 30:19
**familiar** [1] - 13:6
**families** [4] - 24:14, 25:4, 25:5, 56:13
**family** [17] - 8:16, 15:7, 17:8, 19:22, 20:4, 24:20, 25:6, 28:2, 28:10, 33:25, 40:20, 43:22, 54:23, 54:25, 56:25, 59:3
**far** [1] - 14:3
**fashioning** [1] - 48:18
**father** [5] - 11:13, 15:11, 16:24, 17:4, 17:6
**fault** [1] - 28:15
**FDA** [3] - 21:19, 35:21, 42:10
**fear** [1] - 56:13
**February** [1] - 65:16
**federal** [2] - 37:10, 49:8
**feeding** [1] - 19:25
**fell** [1] - 56:22
**fellow** [1] - 8:23
**felon** [1] - 33:19
**felony** [1] - 60:4
**felt** [1] - 56:20
**fete** [1] - 24:11
**few** [5] - 9:6, 12:2, 24:3, 27:22, 40:23
**Fifth** [1] - 1:22
**figure** [2] - 20:2, 27:1
**figured** [1] - 24:4
**figures** [4] - 10:22, 11:2, 11:4, 11:7
**file** [2] - 45:23, 61:14
**filed** [3] - 10:22, 48:18, 61:5
**filing** [1] - 47:11
**final** [1] - 64:21
**financial** [4] - 56:22, 62:15, 62:17, 63:2
**financially** [1] - 54:24
**findings** [1] - 64:9
**fine** [10] - 6:11, 9:16, 21:6, 57:8, 57:9, 57:11, 58:3, 62:8, 62:9, 63:13
**firearm** [1] - 62:2
**firearms** [1] - 34:7
**first** [7] - 8:23, 15:10, 18:3, 31:9, 38:9, 38:13, 38:15
**fits** [1] - 47:24
**five** [2] - 56:5, 58:22
**Flagler** [2] - 2:7, 2:12
**flare** [1] - 52:6
**flare-up** [1] - 52:6
**flew** [1] - 26:6
**Flint** [1] - 23:14
**flip** [2] - 49:6, 49:12
**floors** [1] - 8:23
**FLORIDA** [1] - 1:1
**Florida** [7] - 1:5, 2:8, 2:13, 2:18, 25:16, 29:21, 65:20
**focused** [2] - 24:14, 55:21
**folds** [1] - 47:21
**folks** [3] - 35:9, 35:25, 36:25
**follow** [2] - 23:10, 26:22
**followed** [4] - 28:18, 28:20, 30:7, 46:11
**foot** [2] - 47:4, 48:7
**FOR** [2] - 1:20, 2:3
**Force** [1] - 13:13
**foregoing** [1] - 65:12
**foremost** [1] - 15:10
**forfeiture** [11] - 34:17, 34:21, 39:16, 39:18, 39:23, 40:1, 57:8, 57:11, 58:1, 60:12, 62:6
**form** [1] - 41:6
**formed** [1] - 36:2
**former** [3] - 12:14, 12:19, 49:8
**formulated** [1] - 60:2
**forum** [1] - 34:4
**forward** [1] - 41:8
**forwarded** [1] - 43:15
**fought** [1] - 19:22
**Foundation** [6] - 13:7, 13:10, 14:1, 14:10, 25:2, 37:15
**foundation** [3] - 12:14, 14:3, 24:19
**founded** [1] - 16:18
**founder** [1] - 13:15
**founding** [1] - 35:19
**four** [4] - 12:23, 26:15, 32:5, 32:16
**fourth** [1] - 53:15
**FPR** [2] - 2:16, 65:18
**frankly** [1] - 35:11
**fraud** [5] - 29:23, 31:3, 31:6, 32:24, 32:25
**fraud-type** [1] - 32:25
**fraudulent** [1] - 33:17
**free** [1] - 37:9
**friend** [3] - 13:23, 14:24, 15:5
**friends** [3] - 7:13, 8:16, 33:25
**friendship** [2] - 15:2, 15:3
**front** [3] - 27:17, 40:24, 48:12
**Ft** [1] - 1:5
**full** [2] - 23:22, 55:22
**fully** [3] - 3:4, 28:24, 64:8
**funds** [4] - 57:15, 58:1, 58:2, 63:23
**future** [3] - 45:4, 61:13

## G

**general** [1] - 34:21
**generally** [1] - 59:20
**generosity** [1] - 19:21
**generous** [1] - 26:11
**gentleman** [1] - 53:12
**Georgia** [3] - 2:5, 2:10, 32:18
**giant** [1] - 41:25
**gift** [1] - 19:23
**given** [4] - 34:14, 34:21, 52:6
**GLENDA** [2] - 2:16, 65:18
**GMP** [1] - 24:1
**GNC** [4] - 10:21, 25:14, 33:11, 36:20
**goal** [3] - 11:11, 11:12
**Gold** [4] - 3:13, 3:16, 25:5, 37:15
**Gopin** [1] - 6:21
**GOPIN** [10] - 6:24, 7:6, 7:10, 7:12, 7:14, 7:17, 8:9, 9:4, 11:17, 11:21
**Government** [44] - 4:5, 4:7, 4:19, 21:20, 29:13, 29:16, 29:17, 29:20, 29:22, 31:14, 31:18, 32:5, 32:15, 32:25, 34:19, 35:20, 36:4, 36:6, 37:13, 38:20, 40:21, 44:24, 45:10, 45:22, 46:14, 47:8, 47:24, 48:2, 48:18, 49:5, 49:22, 50:18, 52:3, 53:7, 53:17, 57:6, 57:10, 61:4, 61:6, 61:13, 64:13, 64:22, 65:1
**GOVERNMENT** [1] - 1:20
**Government's** [7] - 3:3, 4:11, 26:25, 36:22, 43:8, 47:11, 53:10
**gracious** [1] - 19:23
**gradually** [1] - 18:7
**grant** [1] - 64:24
**granted** [1] - 65:4
**grateful** [1] - 19:21
**great** [5] - 15:3, 15:11, 15:14, 20:16, 56:8
**Griffin** [1] - 2:4
**GRIPKEY** [1] - 1:20
**gross** [1] - 62:20
**grounds** [1] - 61:8
**grow** [2] - 22:25, 27:22
**grown** [2] - 11:8, 25:13
**growth** [4] - 16:22, 17:2, 17:10, 53:13
**guaranteed** [1] - 23:19
**guess** [3] - 30:11, 38:21, 55:5
**guideline** [6] - 45:11, 57:7, 57:9, 57:11, 58:12, 58:14
**guidelines** [13] - 5:6, 5:7, 41:24, 45:8, 45:9, 58:9, 59:15, 59:17, 59:19, 59:20, 59:21, 59:25, 60:2
**Guidelines** [1] - 59:23
**guilt** [1] - 28:8
**guilty** [21] - 3:14, 4:9, 5:3, 27:20, 27:25, 28:10, 28:20, 37:17, 37:23, 37:24, 38:2, 38:12, 38:14, 38:15, 38:18, 38:24, 48:1, 49:13, 51:19, 58:20, 60:17
**guise** [1] - 28:11
**guns** [1] - 33:4
**guy** [6] - 11:5, 27:5, 34:5, 38:4, 48:6, 49:7
**guys** [2] - 14:7, 33:13
**gynecomastia** [1] - 53:13

## H

**hallmark** [1] - 33:4
**hand** [1] - 9:14
**hands** [1] - 55:1
**Happy** [1] - 20:22
**hard** [1] - 18:16
**hardest** [1] - 26:15
**hardship** [2] - 55:1, 56:22
**harm** [2] - 52:2, 54:19
**Hart** [3] - 23:4, 23:12, 23:25
**head** [3] - 18:13, 37:18
**Health** [4] - 13:6, 13:10, 14:1, 14:10
**health** [1] - 41:21
**healthcare** [1] - 13:11
**healthy** [1] - 44:6
**hear** [1] - 40:21
**heard** [5] - 40:14, 50:1, 50:3, 52:10, 53:21
**hearing** [2] - 60:15, 64:10
**HEARING** [1] - 1:13
**heart** [2] - 10:10, 14:23
**help** [4] - 14:8, 14:22, 36:24, 37:4
**helped** [3] - 19:4, 25:5
**helpful** [1] - 14:15
**helping** [3] - 24:14,

26:7
**hereby** [1] - 65:12
**heroin** [1] - 3:9
**hesitate** [1] - 20:1
**high** [1] - 57:10
**higher** [1] - 57:9
**highest** [4] - 30:1, 31:7, 31:8, 39:16
**himself** [7] - 9:18, 17:15, 17:18, 18:14, 50:17, 60:20, 60:23
**hired** [2] - 23:11, 23:12
**History** [1] - 5:8
**history** [6] - 23:13, 35:3, 58:15, 58:16, 58:18, 58:24
**hold** [1] - 56:15
**holidays** [1] - 56:25
**home** [2] - 15:4, 33:18
**homes** [1] - 8:17
**Honor** [98] - 3:3, 3:13, 3:22, 4:1, 5:10, 5:23, 6:1, 6:5, 6:8, 6:13, 6:18, 6:24, 8:4, 8:9, 9:5, 11:17, 11:23, 12:8, 15:18, 15:23, 16:4, 21:1, 21:4, 21:8, 21:23, 25:21, 28:21, 29:3, 29:5, 29:8, 29:9, 29:17, 30:1, 31:2, 31:5, 31:12, 31:17, 31:19, 32:1, 33:2, 33:21, 34:8, 34:24, 35:1, 35:4, 35:7, 35:15, 36:18, 37:5, 37:20, 38:4, 38:10, 38:13, 38:17, 39:14, 39:24, 40:8, 40:13, 40:16, 40:20, 40:22, 40:24, 41:15, 44:5, 44:16, 45:21, 46:9, 46:20, 47:3, 47:19, 48:17, 48:22, 50:10, 51:9, 51:10, 51:17, 51:24, 52:1, 52:6, 52:10, 52:17, 53:15, 53:20, 53:21, 54:11, 55:11, 56:11, 57:7, 57:13, 57:22, 58:2, 58:5, 58:7, 64:5, 64:6, 64:14, 64:16, 64:21
**HONORABLE** [1] - 1:15
**hospital** [2] - 5:17, 43:22
**hospitalization** [1] - 56:15
**hospitalized** [1] - 43:12
**hour** [1] - 11:6
**hours** [3] - 8:12, 11:14, 38:18
**house** [1] - 24:24
**Houser** [5] - 32:1, 32:7, 32:10, 32:19
**huge** [2] - 25:1, 26:2
**humble** [3] - 9:25, 15:4, 15:19
**humbly** [1] - 15:23
**hundred** [1] - 25:16
**hundreds** [3] - 8:12, 18:24, 20:5
**HUNTER** [1] - 2:9
**hurdle** [2] - 36:23, 36:24
**hurt** [1] - 43:4
**hurting** [1] - 44:1
**husband** [5] - 15:11, 16:15, 16:22, 16:24, 18:10

**I**

**idea** [2] - 36:12, 36:16
**identified** [3] - 29:12, 33:19, 34:3
**identify** [1] - 12:11
**identifying** [1] - 54:14
**illegal** [7] - 21:12, 41:6, 41:14, 43:6, 44:19, 44:23, 45:3
**illegality** [1] - 33:8
**immediately** [1] - 47:20
**impact** [7] - 43:19, 43:22, 53:24, 54:2, 54:17, 54:19, 56:12
**important** [5] - 10:25, 14:14, 30:13, 44:7, 44:25
**impose** [6] - 6:7, 29:4, 58:4, 59:15, 62:8, 62:9
**imposed** [4] - 5:25, 6:4, 30:1, 64:11
**improvement** [1] - 17:20
**improving** [2] - 11:22, 17:18
**incarceration** [1] - 62:18
**incident** [3] - 5:11, 5:14, 5:15
**including** [3] - 4:9, 35:20, 62:5
**increased** [1] - 18:11
**incredible** [2] - 3:23, 15:20
**indicating** [1] - 39:22
**indictment** [6] - 27:20, 53:1, 53:3, 53:4, 53:6, 53:19
**indirectly** [1] - 19:4
**individual** [9] - 31:21, 31:22, 34:2, 40:12, 43:12, 53:7, 53:9, 56:18, 57:14
**individual's** [1] - 61:1
**individuals** [14] - 31:23, 45:5, 52:3, 52:18, 53:2, 54:5, 54:17, 55:6, 56:12, 59:11, 60:6, 60:7, 60:8, 61:12
**individuals'** [1] - 52:19
**industrial** [1] - 7:20
**industry** [5] - 10:12, 23:9, 25:19, 36:14, 37:16
**inexperienced** [1] - 21:14
**inflection** [1] - 22:12
**influence** [1] - 38:22
**inform** [1] - 63:21
**information** [7] - 33:19, 43:13, 46:3, 52:13, 53:8, 54:14, 63:2
**ingredient** [1] - 23:23
**initials** [2] - 43:20, 54:8
**injectable** [3] - 33:9, 37:14, 42:4
**injectables** [1] - 33:24
**instance** [1] - 56:25
**instances** [1] - 8:11
**instead** [1] - 22:4
**instills** [1] - 15:12
**instrumental** [1] - 14:9
**intended** [3] - 47:7, 52:5, 57:5
**intending** [1] - 45:22
**intent** [1] - 58:21
**interest** [1] - 52:5
**interested** [1] - 14:2
**internal** [1] - 45:23
**internet** [3] - 34:4, 42:6, 56:9
**interview** [1] - 49:12
**interviewed** [1] - 23:21
**intimidate** [2] - 38:22, 39:1
**introduce** [1] - 6:21
**introduced** [2] - 7:22, 13:21
**investigation** [2] - 5:22, 43:1
**involve** [1] - 5:11
**involved** [6] - 5:15, 7:19, 28:16, 33:24, 34:7, 63:6
**involvement** [2] - 13:25, 28:15
**involving** [2] - 34:1, 43:9
**Iraq** [1] - 12:24
**issue** [6] - 42:3, 44:5, 45:7, 48:16, 55:25, 64:21
**issues** [1] - 40:23

**J**

**jail** [5] - 18:22, 20:9, 20:13, 27:11, 27:19
**JAMES** [1] - 2:3
**James** [1] - 41:17
**January** [1] - 1:6
**jaundiced** [1] - 53:10
**Jewish** [1] - 9:10
**Jim** [1] - 29:22
**job** [3] - 62:12, 62:13, 62:16
**joint** [1] - 62:10
**Jones** [4] - 30:12, 30:15, 30:17, 30:22
**journal** [1] - 43:13
**Judge** [9] - 6:22, 9:3, 12:12, 15:9, 15:17, 30:12, 30:15, 30:17, 30:22
**JUDGE** [1] - 1:15
**judge** [5] - 4:24, 30:10, 30:14, 59:15, 59:16
**judges** [2] - 59:19, 60:4
**judgment** [3] - 61:4, 61:20, 63:22
**jumpsuit** [1] - 27:18
**June** [1] - 16:9
**jury** [3] - 11:25, 48:12, 53:23
**Justice** [1] - 1:21
**justified** [1] - 30:11
**juxtaposition** [3] - 35:14, 37:6, 37:20
**juxtapositions** [1] - 39:10

**K**

**keep** [2] - 19:18, 20:2
**kept** [1] - 33:13
**Kesto** [1] - 33:16
**Kevin** [1] - 23:14
**key** [3] - 41:17, 42:3, 45:7
**kibosh** [1] - 35:11
**kicking** [1] - 9:18
**kids** [9] - 17:6, 17:7, 18:15, 26:12, 26:14, 26:21, 27:21, 27:22
**kind** [5] - 17:14, 22:19, 26:12, 44:11, 44:15
**kinds** [2] - 21:14, 44:22
**knowing** [1] - 9:12
**knowledge** [2] - 44:1, 52:2
**knowledgeable** [1] - 24:1
**known** [4] - 7:11, 10:18, 35:24
**knows** [3] - 10:9, 41:15, 44:16
**kosher** [3] - 10:8, 10:14

**L**

**L.B** [1] - 56:13
**L.V** [2] - 43:21, 53:5
**lab** [2] - 33:18, 33:23
**label** [1] - 25:10
**labels** [1] - 32:12
**Labs** [12] - 16:16, 16:21, 22:7, 22:16, 28:13, 40:25, 41:18, 42:2, 43:11, 46:20, 46:22, 58:25
**labs** [1] - 33:4
**Labs'** [2] - 48:15, 57:17
**laid** [2] - 24:21, 24:22
**Lambert** [1] - 34:3
**larger** [1] - 17:7
**largest** [7] - 33:23, 34:14, 34:15, 34:18, 34:20, 34:21, 39:15
**last** [5] - 6:10, 7:25, 9:6, 34:3, 49:9
**lasted** [3] - 43:25, 57:4
**late** [1] - 41:1
**Lauderdale** [1] - 1:5
**launder** [1] - 34:1
**law** [13] - 4:10, 10:5, 14:5, 28:11, 40:10, 43:1, 44:11, 44:14, 44:17, 44:20, 57:5, 61:20, 64:9
**laws** [1] - 30:20
**lawyers** [1] - 4:23
**layer** [1] - 33:20
**lead** [1] - 31:5

**leader** [1] - 41:17
**leadership** [2] - 23:16, 40:25
**learn** [1] - 10:2
**learning** [1] - 9:14
**least** [2] - 37:4, 57:14
**leave** [1] - 27:13
**leaving** [2] - 16:21, 28:9
**lectern** [1] - 29:7
**led** [2] - 18:17, 28:2
**left** [6] - 16:15, 22:7, 22:8, 27:9, 28:17, 58:25
**legal** [5] - 5:24, 6:3, 23:11, 23:21, 28:13
**legit** [1] - 37:8
**legitimacy** [3] - 41:25, 42:3, 42:20
**length** [3] - 9:5, 30:12, 30:16
**leniency** [1] - 29:2
**less** [1] - 30:12
**lesser** [1] - 59:11
**lessons** [1] - 15:12
**letter** [7] - 8:4, 8:10, 8:22, 53:6, 53:12, 53:15, 54:20
**letters** [2] - 35:4, 52:7
**letting** [1] - 21:7
**level** [3] - 5:7, 8:14, 8:18
**liability** [2] - 43:17, 62:10
**liberty** [1] - 4:25
**lie** [3] - 41:13, 42:24
**life** [16] - 3:11, 10:24, 11:7, 11:22, 15:12, 16:23, 17:5, 19:6, 22:12, 25:1, 25:3, 35:18, 35:19, 40:7, 43:23, 56:23
**limited** [1] - 4:9
**line** [3] - 9:11, 9:16, 9:22
**list** [2] - 23:15, 44:21
**listed** [1] - 49:14
**literally** [6] - 3:13, 8:22, 9:25, 10:16, 44:11, 49:14
**live** [1] - 17:5
**liver** [2] - 31:6, 56:14
**lives** [2] - 54:18, 54:19
**living** [1] - 18:13
**LLC** [1] - 63:7
**LLP** [1] - 2:9
**loan** [1] - 36:11
**local** [1] - 56:18
**locked** [1] - 20:6
**long-term** [1] - 56:14
**look** [11] - 10:11, 22:18, 22:19, 35:15, 36:7, 37:1, 37:2, 45:5, 48:12, 59:24, 60:9
**looked** [1] - 23:3
**looking** [2] - 8:18, 36:18
**lose** [2] - 11:3, 24:24
**losing** [1] - 11:2
**lost** [2] - 10:22, 25:5
**love** [1] - 3:11
**lowest** [1] - 30:19
**LUBIN** [1] - 2:6
**Lubin** [1] - 2:7
**luck** [2] - 61:8, 64:19
**lucrative** [1] - 44:2

## M

**magistrate** [1] - 4:24
**mail** [2] - 43:9, 55:2
**mails** [1] - 18:25
**major** [4] - 23:9, 24:19, 25:3, 26:16
**man** [9] - 15:4, 15:18, 15:19, 15:24, 17:12, 17:13, 39:12, 48:11, 59:3
**managing** [1] - 41:9
**Maner** [1] - 2:9
**Manfre** [2] - 23:11, 23:20
**manner** [3] - 63:4, 63:9, 64:11
**manufacture** [1] - 63:4
**manufacturer** [1] - 32:3
**manufacturing** [1] - 24:2
**Manufacturing** [1] - 37:11
**Marine** [1] - 13:13
**Marines** [1] - 24:20
**marketing** [1] - 22:19
**marriage** [1] - 18:19
**married** [4] - 16:7, 16:9, 17:25, 18:9
**marrying** [1] - 17:21
**Marshal** [2] - 64:17, 64:18
**Mart** [1] - 36:20
**matter** [2] - 26:20, 65:14
**meal** [1] - 20:3
**mean** [19] - 3:13, 5:3, 10:16, 17:10, 24:9, 30:18, 33:14, 35:20, 36:7, 37:2, 38:4, 39:4, 39:9, 40:4, 48:14, 48:17, 50:20, 54:7, 55:3
**meaning** [2] - 44:17, 47:7
**meaningful** [1] - 56:7
**means** [5] - 10:6, 11:12, 24:9, 32:11, 40:5
**meant** [1] - 43:21
**meat** [1] - 10:7
**medals** [1] - 13:2
**medical** [3] - 52:19, 55:10, 57:16
**meet** [6] - 3:11, 7:4, 7:6, 7:18, 7:20, 7:25
**meeting** [1] - 7:22
**meetings** [1] - 8:24
**MELISSA** [1] - 2:11
**member** [1] - 25:6
**members** [2] - 14:5, 34:1
**memo** [7] - 29:12, 30:10, 31:21, 32:4, 34:9, 43:8, 49:12
**men** [2] - 24:15, 25:3
**mentally** [2] - 17:19, 54:24
**mentioned** [7] - 8:22, 12:19, 14:24, 35:8, 53:2, 53:3, 53:18
**mentor** [1] - 11:8
**mercy** [2] - 28:22, 28:25
**message** [1] - 44:8
**messages** [8] - 18:24, 18:25, 19:2, 19:9, 20:6, 48:3, 49:13, 49:15
**met** [3] - 7:2, 7:21, 8:21
**meted** [1] - 31:7
**Miami** [4] - 2:17, 2:18, 65:19, 65:20
**microphone** [2] - 6:20, 25:25
**middle** [1] - 27:9
**might** [2] - 43:17, 51:24
**military** [5] - 14:18, 24:14, 24:16, 24:20, 25:15
**million** [9] - 24:18, 31:2, 31:5, 32:5, 32:10, 32:16, 34:17, 39:18, 62:6
**millions** [3] - 41:20, 42:22, 45:2
**mind** [1] - 9:19
**minimum** [1] - 62:17
**minutes** [1] - 12:2
**misconduct** [1] - 4:9
**mislead** [2] - 21:18, 28:12
**misrepresenting** [1] - 50:4
**missed** [1] - 8:1
**missing** [2] - 56:21, 56:25
**mistake** [1] - 60:18
**mistakes** [2] - 9:14, 9:24
**mistreated** [1] - 26:24
**mitigating** [15] - 5:4, 51:14, 51:21, 59:1, 59:4, 59:7, 59:10, 59:12, 60:9, 60:12, 60:16, 60:17, 60:21, 60:25, 61:16
**model** [4] - 3:13, 15:14, 35:21
**moment** [2] - 22:7, 51:1
**monetary** [2] - 19:17, 19:23
**moneties** [1] - 10:5
**money** [7] - 10:20, 11:10, 11:12, 14:17, 25:2, 34:1, 36:10
**monster** [1] - 36:19
**month** [4] - 7:23, 24:19, 31:11, 41:11
**monthly** [1] - 62:20
**months** [13] - 5:8, 9:6, 30:2, 30:7, 30:25, 31:8, 31:9, 47:9, 56:21, 58:12, 58:15, 61:21, 61:22
**MORSE** [1] - 2:11
**Morse** [2] - 2:12
**mortgage** [2] - 24:24, 24:25
**most** [3] - 8:7, 26:11, 59:18
**mother** [2] - 19:13, 19:15
**motion** [7] - 45:19, 45:23, 48:19, 61:5, 61:14, 64:22, 64:24
**motion's** [1] - 65:4
**motivation** [4] - 37:22, 38:22, 39:4, 39:5
**moving** [1] - 50:9
**MR** [131] - 3:3, 5:10, 5:15, 5:20, 5:23, 6:1, 6:5, 6:13, 6:15, 6:18, 6:21, 7:4, 7:8, 7:11, 7:13, 7:15, 8:4, 9:2, 11:16, 12:1, 12:8, 12:11, 12:16, 12:19, 12:22, 12:25, 13:4, 13:6, 13:9, 13:14, 13:16, 13:18, 13:20, 13:23, 13:25, 14:9, 14:12, 14:16, 14:20, 14:24, 15:2, 15:6, 15:9, 15:16, 16:1, 16:4, 16:7, 16:10, 16:13, 16:15, 16:18, 16:21, 17:1, 17:9, 17:21, 17:24, 18:2, 18:10, 18:18, 18:21, 19:2, 19:8, 19:11, 19:13, 19:19, 20:5, 20:8, 20:12, 20:15, 20:17, 20:19, 20:23, 21:1, 29:5, 29:7, 30:6, 30:9, 30:14, 30:21, 31:1, 37:24, 38:1, 38:25, 39:24, 40:22, 45:16, 45:21, 46:9, 46:16, 46:20, 46:23, 47:1, 47:3, 47:18, 48:21, 48:23, 49:1, 49:2, 49:8, 49:25, 50:1, 50:3, 50:7, 50:9, 50:14, 50:20, 51:1, 51:4, 51:7, 51:9, 51:10, 51:17, 51:23, 52:1, 52:17, 52:22, 52:24, 53:2, 54:11, 54:16, 55:11, 57:22, 58:5, 58:7, 64:5, 64:6, 64:14, 64:16, 64:21, 65:1, 65:5
**MRS** [24] - 16:9, 16:12, 16:14, 16:17, 16:20, 16:23, 17:3, 17:11, 18:1, 18:5, 18:12, 18:20, 19:3, 19:10, 19:12, 19:15, 19:20, 20:7, 20:11, 20:14, 20:16, 20:18, 20:21, 20:24
**must** [4] - 27:14, 54:25, 62:14, 62:16

## N

**N.W** [1] - 1:22
**name** [3] - 8:24, 12:13, 22:18
**named** [1] - 52:25
**names** [3] - 16:13, 52:19, 54:8
**narrowly** [1] - 24:13
**nation's** [1] - 33:23
**nations** [1] - 3:20
**nature** [1] - 35:2

**Navy** [5] - 12:14, 12:19, 13:2, 13:4, 13:12
**near** [1] - 14:22
**necessarily** [2] - 38:25, 54:21
**necessary** [2] - 52:13, 62:23
**need** [13] - 9:10, 11:19, 23:22, 24:5, 26:10, 27:15, 29:9, 31:14, 39:16, 51:11, 57:2, 57:3, 64:18
**needed** [1] - 24:21
**needs** [3] - 47:10, 52:16, 57:6
**nervous** [1] - 25:23
**never** [9] - 8:15, 9:23, 22:22, 28:16, 39:5, 39:6, 56:24, 57:1, 58:19
**new** [3] - 23:2, 28:19, 36:13
**newborn** [1] - 56:15
**next** [2] - 12:7, 38:8
**nice** [1] - 11:10
**Nick** [1] - 39:7
**nine** [3] - 26:15, 31:11, 58:20
**nine-month** [1] - 31:11
**NO** [1] - 1:2
**nobody** [1] - 10:9
**nobody's** [1] - 28:15
**North** [4] - 2:7, 2:12, 2:17, 65:19
**Northern** [2] - 30:24, 32:18
**note** [2] - 57:7, 57:14
**nothing** [5] - 4:10, 40:5, 48:8, 50:16, 50:22
**notice** [2] - 18:4, 37:13
**notwithstanding** [1] - 32:23
**November** [7] - 37:17, 45:14, 45:17, 47:16, 48:23, 51:19, 60:20
**nuanced** [2] - 50:6, 50:8
**number** [8] - 7:7, 25:14, 40:14, 41:4, 45:2, 52:17, 55:5, 57:4
**numerous** [2] - 3:19, 7:6
**nutrition** [1] - 63:5

## O

**object** [2] - 35:25, 36:21
**objection** [2] - 5:7, 64:10
**objections** [3] - 5:21, 64:8, 64:13
**obligations** [2] - 62:15, 62:17
**observed** [2] - 15:6, 17:2
**obsessing** [1] - 9:12
**obstructing** [1] - 37:10
**obstruction** [1] - 33:5
**obviously** [1] - 53:22
**occurred** [3] - 49:4, 49:5, 49:22
**odds** [1] - 15:20
**OF** [3] - 1:1, 1:5, 1:13
**offense** [2] - 5:7, 35:2
**office** [4] - 7:20, 8:11, 8:23
**officer** [7] - 23:11, 23:15, 23:21, 24:25, 57:23, 63:2, 63:10
**offices** [1] - 8:17
**Official** [1] - 2:16
**officially** [1] - 13:17
**oldest** [2] - 27:9
**Olive** [1] - 26:7
**Oliver** [1] - 2:9
**once** [2] - 7:23, 7:25
**one** [29] - 3:10, 7:21, 8:2, 8:5, 8:7, 10:21, 12:24, 19:8, 20:5, 24:20, 25:14, 26:13, 26:16, 26:19, 30:3, 31:12, 34:3, 34:7, 38:5, 38:16, 39:9, 40:13, 43:8, 43:10, 47:10, 51:1, 57:14, 61:24, 64:21
**ones** [1] - 26:10
**open** [1] - 4:22
**operate** [1] - 63:3
**operating** [1] - 25:16
**operations** [4] - 12:15, 13:12, 14:4, 23:5
**opinion** [2] - 9:25, 15:20
**opportunity** [1] - 27:23
**opposite** [2] - 22:5, 36:15
**option** [1] - 9:23
**oral** [1] - 64:22
**order** [7] - 62:10, 62:22, 63:1, 63:2, 63:8, 63:11, 63:13
**ordered** [1] - 60:15
**organization** [1] - 13:11
**otherwise** [1] - 60:14
**ought** [1] - 41:23
**ourselves** [1] - 10:2
**outside** [2] - 40:13, 48:1
**overcome** [2] - 15:19, 15:22
**overrule** [1] - 5:6
**overt** [1] - 43:1
**overwhelm** [2] - 35:7, 35:12
**overwhelming** [2] - 16:25, 18:25
**own** [5] - 24:19, 26:22, 28:16, 56:15, 63:3
**owner** [1] - 41:20
**ownership** [1] - 63:7
**Oxycontin** [1] - 3:9

## P

**P.A** [1] - 2:7
**P.J** [6] - 37:10, 37:12, 37:13, 38:5, 38:9, 38:19
**p.m** [6] - 1:9, 1:9, 12:4, 65:8
**package** [1] - 20:1
**pact** [1] - 23:4
**Pages** [1] - 1:10
**paid** [6] - 34:16, 60:12, 62:7, 62:13, 62:19, 63:14
**pain** [1] - 56:20
**Palm** [2] - 2:8, 2:13
**pandemic** [1] - 35:13
**parents** [2] - 26:11
**part** [14] - 5:16, 7:17, 23:16, 49:9, 53:4, 53:6, 53:10, 54:7, 54:12, 55:19, 55:21, 57:21, 57:22, 58:14
**participate** [2] - 40:17, 63:4
**participated** [1] - 44:3
**particular** [3] - 3:12, 8:5, 44:10
**particularly** [3] - 41:19, 44:25, 59:6
**parties** [1] - 64:8
**partner** [1] - 32:20
**partnership** [1] - 22:8
**parts** [1] - 50:9
**party** [1] - 64:11
**passed** [1] - 44:12
**passionate** [2] - 14:4, 14:6
**past** [11] - 9:23, 10:2, 15:20, 17:14, 17:22, 18:15, 19:22, 24:3, 27:13, 27:22, 28:3
**Patel** [4] - 30:5, 30:24, 31:9
**pause** [2] - 51:3, 51:8
**pay** [10] - 24:24, 57:8, 60:13, 62:5, 62:8, 62:10, 62:14, 62:16, 62:18, 62:25
**paychecks** [1] - 44:4
**paying** [1] - 24:25
**payment** [1] - 62:21
**penalties** [1] - 27:2
**pending** [2] - 4:20, 46:4
**Pensacola** [2] - 40:19, 63:18
**people** [29] - 3:19, 7:18, 7:20, 8:7, 8:13, 8:20, 10:2, 15:21, 18:23, 19:1, 21:22, 22:18, 23:16, 23:19, 25:21, 26:4, 26:6, 26:8, 31:6, 37:3, 42:13, 42:15, 42:18, 43:4, 44:1, 44:9, 56:5, 56:8, 57:4
**people's** [1] - 8:17
**per** [1] - 62:17
**percent** [4] - 32:9, 41:11, 62:14, 62:20
**perfectly** [1] - 55:11
**perhaps** [1] - 59:18
**period** [3] - 63:5, 63:14, 64:1
**person** [13] - 9:15, 10:10, 15:15, 16:24, 17:12, 18:9, 33:24, 43:18, 43:19, 46:4, 47:23, 58:1, 63:9
**personal** [5] - 10:24, 14:21, 33:18, 54:13, 56:6
**persuasive** [3] - 58:13, 63:16, 63:19
**pertains** [1] - 9:8
**philosophy** [1] - 9:10
**Phoenix** [1] - 12:18
**phone** [1] - 8:3
**phonetic** [1] - 33:16
**physical** [1] - 54:19
**physically** [2] - 17:19, 54:24
**pick** [2] - 29:15, 39:14
**picked** [2] - 29:24, 34:12
**picking** [1] - 18:7
**pinnacle** [2] - 25:18, 25:19
**place** [2] - 10:7, 61:23
**placed** [1] - 58:22
**PLAINTIFF** [1] - 1:6
**plan** [1] - 11:21
**plea** [32] - 3:14, 4:6, 4:7, 4:18, 18:7, 18:14, 27:20, 28:10, 28:20, 38:11, 38:12, 38:15, 38:19, 45:14, 45:17, 46:7, 46:11, 46:14, 47:6, 47:15, 47:20, 47:21, 48:14, 48:15, 49:13, 51:20, 61:3
**pleading** [3] - 4:9, 27:25, 38:2
**pleadings** [1] - 41:16
**pleads** [1] - 37:17
**pleas** [5] - 4:22, 31:19, 31:20, 38:14
**pled** [9] - 5:3, 37:23, 37:24, 38:23, 46:3, 48:1, 51:19, 58:20, 60:17
**plus** [3] - 10:22, 45:2, 57:19
**podium** [3] - 6:16, 12:10, 16:6
**point** [10] - 7:25, 9:13, 22:12, 29:9, 29:19, 32:1, 32:4, 33:3, 50:19, 54:16
**pointed** [3] - 29:12, 30:4, 37:12
**points** [1] - 3:25
**position** [3] - 40:25, 57:20, 61:9
**positive** [1] - 24:9
**possess** [1] - 62:3
**possessing** [1] - 62:2
**possession** [1] - 58:20
**possibility** [4] - 45:18, 46:14, 46:16, 46:17
**possible** [3] - 29:2, 60:23, 60:24
**possibly** [1] - 28:22
**potential** [1] - 52:2
**powder** [1] - 19:18
**Powers** [1] - 65:17
**POWERS** [2] - 2:16, 65:18
**Practices** [1] - 37:12
**prayer** [1] - 54:25
**precisely** [1] - 57:5
**prescribed** [1] - 55:5
**prescription** [1] - 55:9
**present** [2] - 12:6

**presented** [1] - 4:23
**presentence** [2] - 5:21, 36:9
**president** [2] - 13:15, 23:4
**press** [1] - 34:20
**pressured** [1] - 33:25
**pretrial** [1] - 4:20
**pretty** [4] - 24:13, 29:21, 34:24, 47:23
**prevent** [1] - 44:11
**prevented** [1] - 46:25
**pride** [3] - 11:5, 11:9, 17:3
**primary** [1] - 32:11
**principles** [1] - 17:5
**priority** [2] - 17:8, 24:12
**prison** [11] - 11:20, 27:18, 30:25, 34:14, 60:8, 60:24, 60:25, 61:21, 61:22, 62:14
**Prisons** [3] - 40:17, 63:17, 63:20
**probation** [8] - 30:8, 32:19, 32:21, 39:21, 57:23, 58:22, 63:2, 63:10
**problem** [2] - 4:4, 60:1
**proceed** [1] - 6:13
**proceedings** [4] - 51:3, 51:8, 65:8, 65:14
**proceeds** [1] - 36:5
**process** [1] - 26:16
**processed** [1] - 3:14
**processes** [1] - 24:2
**produced** [1] - 46:5
**product** [7] - 3:16, 23:22, 25:10, 36:11, 36:19, 37:7, 43:12
**products** [33] - 21:11, 21:18, 24:2, 25:12, 28:13, 33:7, 33:10, 41:5, 41:14, 42:1, 42:7, 42:8, 42:10, 42:11, 42:13, 42:16, 42:18, 42:23, 43:11, 44:1, 44:19, 44:21, 44:22, 45:3, 49:14, 52:3, 53:14, 55:13, 55:18, 55:20, 55:23, 57:17
**profession** [1] - 12:12
**proffer** [5] - 41:6, 41:15, 46:1, 46:2, 55:19
**profit** [1] - 41:7
**program** [2] - 40:17, 63:15
**progress** [1] - 20:4
**prohibit** [2] - 44:14, 57:6
**prohibited** [1] - 62:2
**prohormones** [1] - 33:10
**promotes** [1] - 40:9
**prongs** [1] - 25:9
**proof** [1] - 10:4
**property** [1] - 63:9
**proportion** [2] - 56:1, 56:3
**proposal** [1] - 4:24
**prosecute** [1] - 63:24
**prosecuted** [2] - 26:24, 29:14
**prosecuting** [1] - 31:18
**prosecution** [2] - 47:23, 50:25
**prosecutor** [1] - 49:8
**prospect** [1] - 28:9
**prospective** [1] - 57:16
**protein** [1] - 19:18
**proud** [8] - 22:16, 22:23, 22:24, 22:25, 25:17, 25:18, 28:23, 35:20
**provide** [2] - 39:17, 63:1
**provided** [4] - 8:4, 46:3, 49:13, 49:16
**provides** [4] - 13:11, 14:3, 14:17, 15:21
**PSI** [1] - 36:18
**public** [4] - 26:1, 54:2, 54:6, 54:8
**published** [2] - 43:10, 43:13
**punish** [2] - 44:14, 57:3
**punishment** [3] - 30:18, 40:10, 60:5
**purchased** [1] - 42:13
**purchasing** [1] - 42:17
**purpose** [4] - 24:8, 25:1, 45:9
**purpose-driven** [2] - 24:8
**pursuit** [1] - 17:18
**push** [1] - 36:23
**put** [11] - 18:18, 25:25, 34:20, 35:10, 41:25, 43:20, 54:23, 55:23, 56:2, 56:23, 57:23
**putting** [1] - 37:8

## Q

**quality** [1] - 42:7
**quarter** [1] - 62:17
**quarters** [1] - 35:13
**questioning** [1] - 3:4
**questions** [3] - 6:18, 54:22
**quite** [1] - 35:11
**quote** [1] - 8:5
**quoting** [1] - 9:25

## R

**R.J** [1] - 52:23
**R.R** [3] - 52:23, 53:15, 56:20
**R.Y** [3] - 53:12, 57:15, 57:19
**Rabbi** [4] - 6:15, 7:4, 8:5, 11:18
**rabbi** [2] - 6:21, 9:2
**RABBI** [10] - 6:24, 7:6, 7:10, 7:12, 7:14, 7:17, 8:9, 9:4, 11:17, 11:21
**rail** [1] - 39:1
**raise** [1] - 8:15
**raised** [2] - 32:4, 45:8
**raising** [1] - 15:14
**random** [1] - 29:25
**randomly** [1] - 29:15
**range** [6] - 5:8, 55:23, 57:9, 57:11, 58:12, 58:14
**ranges** [1] - 45:1
**rapidly** [1] - 25:14
**rarely** [2] - 8:14, 9:1
**rat** [5] - 37:19, 38:2, 38:9, 39:4, 39:6
**rate** [1] - 62:19
**rationale** [1] - 38:1
**Raton** [1] - 7:1
**RDAP** [2] - 40:17, 63:15
**reached** [1] - 19:1
**react** [1] - 27:8
**reactions** [1] - 55:10
**read** [6] - 8:9, 19:19, 19:20, 21:4, 34:10, 40:15
**READER** [36] - 1:20, 40:22, 45:16, 45:21, 46:9, 46:16, 46:20, 46:23, 47:1, 48:21, 49:1, 50:1, 50:3, 50:9, 50:14, 50:20, 51:1, 51:4, 51:7, 51:10, 51:17, 51:23, 52:1, 52:17, 52:22, 52:24, 53:2, 54:11, 54:16, 55:11, 58:5, 64:6, 64:14, 64:21, 65:1, 65:5
**reader** [5] - 35:23, 47:4, 50:2, 51:13, 57:25
**reader's** [1] - 47:10
**real** [3] - 8:20, 43:18, 44:5
**realize** [4] - 27:19, 28:25, 59:14, 61:13
**realizing** [2] - 63:15, 63:18
**really** [8] - 8:18, 9:1, 24:7, 41:7, 41:23, 43:21, 52:13, 53:24
**reason** [6] - 42:17, 42:20, 45:8, 49:17, 49:23, 58:14
**reasonable** [5] - 29:1, 45:9, 58:11, 63:8, 63:9
**reasons** [1] - 41:23
**receive** [2] - 34:11, 41:11
**received** [7] - 12:25, 18:23, 18:24, 19:11, 20:6, 45:1, 59:11
**recent** [1] - 18:2
**recently** [2] - 24:20, 53:7
**recess** [5] - 11:24, 12:2, 12:4, 64:20, 65:6
**recidivist** [1] - 34:2
**recognizes** [1] - 40:11
**recollection** [2] - 5:13, 52:21
**recommend** [5] - 4:8, 40:16, 57:10, 63:15, 63:18
**recommendation** [3] - 34:9, 63:16, 63:19
**recommended** [1] - 34:11
**recommending** [2] - 4:5, 4:11
**reconstituted** [1] - 59:24
**record** [7] - 5:11, 5:12, 12:5, 43:21, 54:2, 54:8, 54:12
**recover** [1] - 54:24
**recovered** [1] - 57:1
**red** [1] - 25:24
**redacted** [2] - 54:8, 54:13
**REDCON** [12] - 3:12, 3:16, 3:18, 17:13, 25:18, 36:1, 36:10, 36:23, 36:24, 37:15, 63:7
**REDCON1** [14] - 16:18, 22:6, 23:1, 23:3, 23:5, 24:7, 24:19, 25:2, 25:9, 35:22, 37:6, 39:12, 40:7, 59:1
**reference** [1] - 31:10
**referenced** [1] - 31:4
**refresh** [2] - 5:13, 52:21
**regard** [1] - 41:21
**regarding** [2] - 40:10, 59:6
**regards** [8] - 15:17, 15:20, 17:1, 17:9, 32:19, 46:3, 47:7, 47:25
**regular** [1] - 42:18
**regulation** [1] - 21:12
**regulatory** [1] - 25:20
**related** [3] - 32:20, 34:9, 53:19
**relates** [21] - 3:9, 3:12, 3:23, 5:18, 6:1, 29:17, 31:6, 31:13, 32:9, 34:8, 34:13, 34:18, 34:23, 35:22, 36:21, 37:20, 38:7, 39:9, 39:16, 40:14, 47:13
**relating** [2] - 34:14, 46:5
**relationship** [2] - 7:15, 7:24
**release** [9] - 4:20, 34:20, 61:23, 61:24, 62:1, 62:5, 62:18, 63:12, 63:14
**relief** [1] - 39:20
**relying** [1] - 54:3
**remain** [2] - 4:19, 4:24
**remarks** [1] - 21:2
**remember** [2] - 22:21, 55:3
**remorse** [2] - 9:8, 9:11
**remorseful** [2] - 3:4, 9:20
**removed** [2] - 40:25, 44:3
**repeat** [1] - 8:10
**repent** [1] - 10:6
**repentance** [1] - 10:5
**repentant** [1] - 10:15
**repercussions** [2] - 27:3, 27:15
**replaced** [1] - 57:1
**replacements** [1] -

20:3
**report** [3] - 5:22, 36:9, 39:22
**REPORTED** [1] - 2:16
**Reporter** [1] - 2:16
**represent** [4] - 39:25, 40:19, 52:8, 63:25
**represented** [2] - 39:25, 50:6
**represents** [1] - 48:13
**requesting** [1] - 61:19
**respect** [3] - 8:14, 8:20, 40:10
**respecting** [1] - 8:18
**respond** [1] - 55:1
**response** [2] - 8:21, 29:22
**responses** [2] - 18:23, 36:25
**responsibility** [9] - 3:25, 4:4, 4:5, 4:8, 4:12, 4:14, 5:2, 28:8, 31:22
**responsible** [1] - 42:24
**restitution** [15] - 39:17, 39:22, 40:3, 55:12, 57:12, 57:19, 57:21, 57:23, 58:3, 60:13, 60:14, 62:11, 62:13, 62:19, 63:13
**restoration** [2] - 39:19, 40:2
**result** [4] - 13:1, 31:18, 42:1, 45:11
**resulted** [1] - 48:14
**results** [1] - 57:16
**retaliation** [1] - 60:24
**returning** [1] - 55:12
**revoked** [1] - 18:21
**ribbons** [1] - 13:3
**RICHARD** [1] - 2:6
**Richard** [1] - 2:7
**ring** [1] - 42:5
**rise** [3] - 12:3, 65:7
**risk** [2] - 56:2, 56:4
**risks** [3] - 45:3, 54:18, 55:9
**ROBERT** [1] - 2:3
**role** [1] - 13:14
**room** [1] - 27:10
**Root** [1] - 33:23
**Rosario** [5] - 12:9, 12:11, 12:13, 16:1, 26:13
**ROSARIO** [25] - 12:10, 12:13, 12:17, 12:21, 12:23, 13:2, 13:5, 13:8, 13:10, 13:15, 13:17, 13:19, 13:21, 13:24, 14:2, 14:11, 14:13, 14:19, 14:21, 15:1, 15:3, 15:8, 15:10, 15:18, 16:3
**RPR** [2] - 2:16, 65:18
**Rule** [1] - 61:14
**ruled** [1] - 27:11
**Rules** [4] - 15:13, 17:5, 26:14, 26:19
**rules** [1] - 26:22
**run** [6] - 12:14, 42:5, 45:1, 61:22, 61:24
**running** [2] - 23:5, 23:16

## S

**S.L** [3] - 53:3, 53:18, 56:18
**s/Glenda** [1] - 65:17
**safety** [1] - 25:19
**sale** [2] - 37:9, 49:14
**sales** [1] - 3:19
**sang** [1] - 20:22
**SARNs** [1] - 55:21
**sat** [2] - 8:11, 48:1
**satisfy** [1] - 34:22
**Savannah** [2] - 2:5, 2:10
**saving** [1] - 47:8
**saw** [3] - 25:24, 43:8, 54:6
**schedule** [1] - 62:21
**Scheduled** [1] - 1:9
**scheduled** [1] - 38:13
**scheme** [2] - 42:19, 54:17
**school** [1] - 22:17
**scientific** [2] - 43:10, 43:13
**scorable** [1] - 58:17
**scored** [1] - 5:7
**scrambling** [1] - 20:2
**seal** [2] - 52:4, 52:14
**Seal** [2] - 12:14, 12:20
**sealed** [2] - 52:16, 54:5
**Sean** [4] - 12:9, 12:13, 17:4, 26:13
**SEAN** [25] - 12:10, 12:13, 12:17, 12:21, 12:23, 13:2, 13:5, 13:8, 13:10, 13:15, 13:17, 13:19, 13:21, 13:24, 14:2, 14:11, 14:13, 14:19, 14:21, 15:1, 15:3, 15:8, 15:10, 15:18, 16:3
**search** [2] - 37:11, 63:8
**seat** [1] - 6:19
**second** [9] - 5:11, 5:13, 5:15, 17:15, 22:14, 33:1, 35:8, 50:4, 53:5
**Section** [1] - 58:10
**see** [11] - 3:5, 8:14, 8:20, 9:1, 10:13, 15:24, 27:21, 31:23, 34:20, 54:6, 59:24
**seek** [1] - 46:2
**seeking** [1] - 57:15
**sell** [4] - 21:11, 36:11, 41:14, 44:23
**selling** [9] - 24:10, 28:12, 33:7, 33:10, 33:11, 33:13, 37:2, 37:14, 45:2
**sells** [1] - 10:7
**send** [3] - 20:1, 24:3, 44:7
**sending** [1] - 37:18
**sense** [1] - 53:3
**sent** [4] - 8:10, 19:16, 19:17, 40:19
**sentence** [30] - 5:5, 5:24, 6:4, 6:7, 29:1, 29:4, 30:12, 30:13, 30:16, 31:11, 34:10, 34:11, 34:14, 34:20, 39:14, 39:15, 40:8, 44:7, 45:11, 47:11, 48:18, 57:7, 58:4, 58:11, 60:11, 61:10, 61:20, 63:22, 64:11, 64:18
**sentenced** [5] - 30:17, 34:5, 34:6, 41:24, 61:21
**sentences** [9] - 29:21, 31:7, 31:25, 34:23, 45:1, 59:12, 59:13, 59:22, 60:8
**SENTENCING** [1] - 1:13
**sentencing** [18] - 4:20, 4:21, 29:10, 29:12, 30:20, 31:15, 32:4, 34:9, 38:6, 40:11, 41:16, 43:8, 45:10, 47:13, 57:25, 58:8, 60:15, 64:10
**separate** [1] - 24:7
**series** [1] - 52:4
**serve** [2] - 6:22, 7:1
**service** [3] - 13:1, 24:15, 25:3
**services** [1] - 13:11
**serving** [1] - 7:2
**set** [1] - 17:16
**seven** [4] - 10:22, 11:2, 11:3, 56:21
**several** [2] - 52:5, 62:10
**severe** [1] - 45:6
**shall** [5] - 62:1, 62:2, 62:3, 62:4, 62:18
**share** [2] - 53:23, 56:6
**shirts** [1] - 22:16
**Shoppe** [1] - 25:15
**shoulders** [1] - 36:2
**show** [3] - 5:24, 6:3, 33:2
**showed** [1] - 44:18
**shown** [2] - 10:17, 19:21
**shows** [2] - 5:17, 43:6
**Shula** [1] - 10:5
**sick** [1] - 56:16
**sidebar** [1] - 51:9
**signed** [11] - 38:12, 38:15, 38:19, 45:14, 46:7, 46:13, 47:8, 47:15, 51:19
**significant** [3] - 18:18, 30:16, 56:13
**signing** [2] - 38:18
**signs** [2] - 47:20, 47:21
**Silva** [1] - 23:6
**similar** [3] - 29:14, 33:21, 33:22
**sincere** [1] - 8:7
**Singerman** [79] - 3:14, 4:3, 4:17, 4:23, 5:1, 5:16, 6:6, 7:9, 9:19, 11:18, 13:18, 13:25, 14:9, 14:17, 15:13, 15:17, 16:5, 16:15, 17:2, 17:4, 21:1, 26:14, 26:19, 29:18, 34:11, 34:16, 35:17, 36:1, 36:22, 37:11, 37:21, 38:8, 38:12, 38:15, 38:18, 39:20, 40:12, 40:14, 40:15, 40:18, 40:24, 41:9, 41:17, 41:23, 42:9, 43:5, 43:9, 43:16, 44:2, 45:8, 45:11, 45:14, 46:1, 46:11, 46:13, 46:15, 46:18, 46:21, 46:24, 47:5, 47:15, 47:20, 47:25, 48:5, 48:10, 49:6, 49:10, 49:20, 49:24, 50:12, 50:17, 50:23, 51:19, 57:8, 60:3, 61:21, 63:21, 64:19, 65:3
**SINGERMAN** [26] - 1:8, 16:6, 16:9, 16:12, 16:14, 16:17, 16:20, 16:23, 17:3, 17:11, 18:1, 18:5, 18:12, 18:20, 19:3, 19:10, 19:12, 19:15, 19:20, 20:7, 20:11, 20:14, 20:16, 20:18, 20:21, 20:24
**Singerman's** [6] - 12:6, 38:23, 47:6, 49:19, 52:2, 58:15
**single** [3] - 3:10, 38:5, 55:13
**Sitish** [1] - 30:5
**sits** [1] - 15:18
**situation** [3] - 11:1, 54:23, 56:8
**six** [6] - 11:7, 21:24, 21:25, 22:15, 26:15, 28:17
**skirt** [1] - 21:21
**slapping** [1] - 32:12
**slowly** [1] - 56:23
**small** [3] - 10:19, 29:22, 56:3
**smaller** [1] - 49:7
**social** [1] - 4:3
**society** [2] - 16:24, 56:1
**sold** [12] - 28:11, 29:11, 29:25, 34:13, 36:20, 42:10, 42:12, 44:13, 55:13, 55:16, 55:20, 55:24
**sole** [1] - 61:3
**someone** [4] - 9:10, 10:7, 58:19, 60:4
**somewhere** [1] - 44:22
**son** [2] - 19:16, 19:18
**soon** [1] - 38:5
**sorry** [3] - 26:20, 50:20, 55:17
**sort** [2] - 45:4, 54:18
**sounds** [2] - 5:19, 61:17
**Southern** [1] - 29:21
**SOUTHERN** [1] - 1:1
**spaces** [1] - 7:20
**speaking** [2] - 52:1, 59:20
**special** [6] - 12:15, 13:12, 14:4, 62:5, 62:9, 63:13
**specific** [2] - 46:3, 48:2
**specifically** [1] - 44:13
**speech** [2] - 3:7, 3:8

**spending** [2] - 53:20, 56:21
**spent** [1] - 17:6
**spiritually** [1] - 17:19
**spoken** [2] - 9:5, 56:11
**sports** [2] - 24:10, 36:14
**spot** [1] - 10:13
**spot-check** [1] - 10:13
**spotlight** [1] - 26:1
**spouse** [1] - 11:13
**spring** [1] - 41:1
**staff** [2] - 23:6, 35:12
**stale** [1] - 58:17
**stand** [2] - 6:16, 49:20
**standard** [3] - 3:16, 37:15, 62:4
**Star** [1] - 25:5
**stars** [1] - 13:3
**start** [8] - 6:22, 21:8, 22:2, 22:21, 24:5, 36:10, 37:7, 40:7
**started** [12] - 7:22, 11:6, 18:3, 18:5, 18:6, 18:7, 21:11, 22:5, 23:2, 39:12, 48:25, 59:1
**starting** [1] - 24:18
**State** [1] - 2:10
**statement** [3] - 4:3, 43:19, 56:20
**statements** [2] - 52:4, 57:15
**STATES** [3] - 1:1, 1:5, 1:15
**States** [7] - 1:21, 2:17, 30:4, 43:3, 58:9, 59:14, 65:19
**stay** [2] - 19:25, 27:19
**stayed** [1] - 23:24
**staying** [1] - 60:18
**stays** [1] - 43:22
**stealing** [1] - 33:18
**STENOGRAPHICAL LY** [1] - 2:15
**STEPHEN** [1] - 1:20
**stepped** [2] - 47:4, 48:7
**steroid** [10] - 29:20, 29:23, 33:1, 33:2, 33:4, 33:9, 41:25, 42:4, 49:14, 55:8
**Steroid** [1] - 44:12
**steroid-like** [1] - 55:8
**steroids** [22] - 29:11, 29:25, 32:6, 33:22, 34:4, 34:13, 37:14, 41:5, 41:14, 42:11, 42:12, 42:22, 44:13, 44:21, 44:22, 45:2, 55:4, 55:8, 55:16, 55:17, 55:22, 56:9
**sticking** [1] - 39:2
**stigma** [1] - 60:4
**still** [5] - 13:4, 41:4, 46:4, 56:14, 56:19
**stimulants** [1] - 55:20
**stood** [1] - 38:3
**stop** [1] - 8:24
**stories** [1] - 56:6
**strain** [2] - 18:18, 54:23
**Street** [3] - 1:22, 2:4, 2:10
**stress** [4] - 3:23, 18:12, 27:7, 27:25
**stressed** [1] - 28:9
**stressing** [1] - 15:13
**stricken** [1] - 19:14
**struggles** [1] - 17:22
**study** [3] - 43:10, 43:18, 43:20
**stuff** [1] - 37:2
**subject** [4] - 43:20, 53:9, 53:22, 54:21
**subjected** [1] - 60:23
**submission** [1] - 53:11
**submit** [3] - 52:7, 56:2, 63:8
**submitted** [2] - 52:4, 55:6
**substance** [4] - 15:21, 15:22, 17:22, 40:15
**substances** [4] - 28:11, 55:8, 58:21, 62:4
**substantial** [9] - 45:18, 45:19, 45:23, 47:22, 50:18, 50:24, 51:14, 51:20, 61:5
**success** [3] - 14:10, 22:3, 59:1
**successful** [2] - 11:7, 42:21
**successfully** [1] - 62:23
**sudden** [2] - 31:23, 33:1
**sufficient** [1] - 58:11
**suggesting** [1] - 50:4
**Suite** [1] - 2:5
**summarized** [1] - 54:5
**summer** [1] - 13:21
**Sunday** [1] - 20:17
**Super** [1] - 43:11
**supervised** [6] - 61:23, 61:24, 62:1, 62:5, 63:12, 63:14
**supervision** [1] - 63:5
**supervisors** [1] - 45:24
**supplement** [4] - 19:17, 24:3, 36:14, 37:16
**supplements** [10] - 19:24, 24:10, 28:12, 28:13, 29:11, 29:25, 34:13, 42:23, 44:14, 63:5
**supplied** [2] - 32:7
**supplier** [1] - 32:11
**support** [8] - 11:19, 14:3, 14:17, 25:22, 26:6, 59:4
**supporting** [2] - 26:9
**Supreme** [1] - 59:14
**surgery** [1] - 57:16
**surrendering** [1] - 60:19
**surrogates** [1] - 37:19
**swept** [1] - 8:23
**switch** [1] - 35:1
**synagogue** [2] - 7:1, 7:18
**synthetic** [1] - 55:20

**T**

**tailored** [1] - 40:9
**talks** [1] - 38:8
**TANNER** [1] - 2:3
**Tanner** [1] - 2:4
**taught** [1] - 26:11
**teach** [1] - 26:12
**team** [2] - 23:8, 23:16
**ten** [1] - 55:17
**tens** [5] - 55:15, 55:16, 55:17, 55:25
**term** [1] - 56:14
**terms** [6] - 24:17, 35:12, 39:19, 40:18, 47:22, 49:9
**terrible** [1] - 28:2
**testified** [2] - 31:10, 52:12
**testify** [6] - 32:2, 46:15, 46:18, 46:22, 47:22, 53:16
**testifying** [2] - 48:6, 48:11
**testimony** [4] - 52:15, 53:22, 54:21, 55:3
**Texas** [1] - 30:24
**text** [5] - 18:24, 19:9, 48:2, 49:13, 49:15
**textbook** [1] - 10:16
**thankful** [1] - 35:9
**Thanksgiving** [2] - 48:22, 48:24
**THE** [76] - 1:15, 1:20, 2:3, 4:2, 5:13, 5:19, 5:21, 5:24, 6:3, 6:6, 6:8, 6:11, 6:12, 6:14, 6:16, 6:19, 11:18, 11:24, 12:2, 12:5, 16:2, 20:25, 21:3, 21:4, 21:6, 21:7, 29:4, 29:6, 30:3, 30:7, 30:10, 30:15, 30:23, 37:22, 37:25, 38:21, 39:21, 40:21, 45:13, 45:17, 46:6, 46:13, 46:17, 46:21, 46:24, 47:14, 48:20, 48:25, 49:3, 49:21, 50:2, 50:11, 50:16, 50:22, 51:2, 51:6, 51:11, 51:18, 51:25, 52:12, 52:21, 52:23, 52:25, 54:1, 54:15, 55:3, 57:18, 58:4, 58:6, 58:8, 64:7, 64:15, 64:17, 64:24, 65:4, 65:6
**themselves** [1] - 59:10
**theory** [1] - 3:6
**third** [1] - 53:12
**thousands** [10] - 42:11, 43:2, 43:3, 44:9, 55:15, 55:16, 55:17, 55:18, 56:1
**threats** [1] - 60:23
**three** [7] - 12:23, 15:11, 16:12, 22:24, 33:3, 41:23, 61:23
**throughout** [4] - 3:20, 11:21, 26:16, 31:14
**Thursday** [1] - 1:7
**tickets** [1] - 5:18
**timing** [1] - 38:10
**tissue** [1] - 53:13
**today** [14] - 11:6, 15:24, 16:2, 20:25, 23:6, 25:21, 27:15, 28:19, 35:15, 39:25, 40:6, 47:13, 56:19, 57:25
**together** [2] - 38:14, 56:23
**took** [3] - 4:17, 17:13, 23:25
**top** [1] - 33:20
**torn** [1] - 36:14
**totaling** [1] - 5:17
**totally** [2] - 24:5, 37:8
**tough** [1] - 26:8
**towards** [3] - 54:8, 62:15, 62:17
**trading** [1] - 33:21
**trafficking** [1] - 42:5
**transcription** [1] - 65:13
**transformed** [1] - 18:8
**transplants** [1] - 31:6
**trashing** [1] - 39:3
**treated** [5] - 26:24, 31:16, 32:22, 33:15, 34:25
**treatment** [2] - 62:23, 62:24
**treatments** [1] - 19:25
**treats** [1] - 59:8
**tremendous** [5] - 15:11, 17:3, 26:17, 27:7, 56:22
**tremendously** [1] - 11:8
**trial** [14] - 31:10, 32:2, 41:16, 46:5, 46:8, 47:2, 48:10, 48:25, 49:4, 49:24, 50:13, 53:16, 53:17, 55:21
**tried** [2] - 27:13, 49:11
**Trigili** [1] - 39:7
**trip** [3] - 19:24, 23:25, 56:19
**Tripp** [2] - 19:22, 20:1
**trouble** [1] - 24:23
**truly** [1] - 10:6
**trust** [1] - 10:9
**truth** [4] - 21:8, 21:15, 26:19
**try** [6] - 7:18, 10:3, 22:22, 36:13, 38:22, 49:18
**trying** [3] - 39:1, 50:17, 55:4
**tube** [1] - 19:25
**Tuesday** [1] - 48:24
**turned** [4] - 18:8, 20:17, 35:18, 36:19
**turning** [2] - 3:17, 3:18
**turns** [1] - 10:8
**two** [12] - 3:25, 8:2, 11:14, 22:25, 24:7, 25:9, 25:13, 38:14, 47:9, 52:2, 56:21
**type** [9] - 4:15, 17:17, 23:18, 23:19, 32:25, 33:2, 39:15, 54:25, 57:5
**types** [3] - 31:24, 59:22, 60:2

**U**

**U.S** [3] - 33:16, 33:23, 34:3

**ultimately** [1] - 44:17
**unacceptable** [1] - 44:9
**unconstitutional** [1] - 61:8
**under** [8] - 4:19, 27:25, 28:11, 29:8, 29:9, 41:25, 52:4, 52:10
**underground** [5] - 33:4, 33:9, 33:23, 34:4, 42:5
**underling** [1] - 48:11
**underrepresented** [1] - 58:24
**undone** [1] - 9:23
**undue** [1] - 3:23
**unfairly** [1] - 26:23
**unfortunately** [3] - 24:21, 28:5, 56:24
**Unicore** [3] - 62:12, 62:13, 62:16
**UNITED** [3] - 1:1, 1:5, 1:15
**united** [1] - 2:17
**United** [6] - 1:21, 30:4, 43:3, 58:9, 59:14, 65:19
**University** [2] - 12:17, 12:18
**unlawful** [1] - 55:13
**unless** [1] - 61:7
**unlikely** [1] - 50:15
**unpaid** [1] - 63:13
**unrecognizable** [1] - 18:8
**unreviewable** [1] - 61:4
**unsafe** [2] - 42:17, 44:23
**unwarranted** [3] - 29:10, 31:15, 34:23
**unwitting** [1] - 42:15
**unwittingly** [1] - 56:2
**up** [28] - 3:15, 5:17, 10:11, 18:7, 20:6, 21:15, 22:18, 22:19, 22:25, 23:2, 24:25, 25:23, 26:13, 27:7, 27:22, 28:18, 28:20, 36:14, 37:8, 38:3, 40:24, 47:24, 48:16, 49:12, 52:6, 58:10, 60:10, 61:3
**upset** [1] - 10:23

## V

**Valor** [1] - 13:3
**values** [1] - 26:12
**variance** [3] - 30:11, 51:16, 59:16
**variety** [2] - 32:8, 45:1
**various** [1] - 24:18
**vehicle** [1] - 55:7
**veneer** [3] - 41:24, 42:3, 42:20
**verdict** [1] - 11:25
**version** [1] - 54:13
**versus** [1] - 30:4
**veterans** [5] - 12:15, 13:12, 14:4, 24:14, 59:6
**victim** [9] - 38:9, 39:18, 39:19, 40:1, 43:19, 52:10, 53:5, 54:14, 57:15
**victims** [7] - 42:2, 52:4, 52:5, 53:25, 54:2, 55:6
**video** [2] - 9:9, 25:24
**videos** [2] - 38:4, 39:8
**Videotape** [1] - 3:2
**view** [4] - 30:19, 30:21, 30:22, 55:7
**views** [1] - 59:12
**violated** [2] - 28:11, 47:2
**violation** [2] - 27:18, 27:24
**Virginia** [1] - 30:5
**visit** [1] - 7:21
**visiting** [1] - 7:19
**visits** [1] - 8:14
**Vitamin** [1] - 25:15
**voice** [1] - 8:15
**volume** [1] - 42:1
**voluntarily** [1] - 34:16
**voluntary** [1] - 5:16
**VS** [1] - 1:7

## W

**wages** [1] - 62:14
**wagon** [1] - 3:23
**Wait** [1] - 33:1
**waiting** [1] - 28:7
**waiver** [2] - 64:2, 64:3
**Wal** [1] - 36:20
**Wal-Mart** [1] - 36:20
**walk** [2] - 9:11, 9:16
**walking** [2] - 9:17, 33:8
**WalMart** [1] - 25:14
**wants** [4] - 14:6, 36:4, 36:6, 54:6
**warrant** [1] - 37:11
**Warrior** [4] - 13:6, 13:10, 14:1, 14:10
**wash** [1] - 36:4
**washington** [1] - 1:22
**watched** [3] - 9:9, 10:18, 10:19
**watching** [1] - 10:13
**wavering** [1] - 28:7
**wear** [1] - 22:16
**wearing** [1] - 27:18
**web** [1] - 33:17
**website** [2] - 37:1, 42:7
**wedding** [1] - 3:7
**week** [3] - 7:25, 8:2, 18:23
**weekly** [4] - 7:5, 7:7, 7:21
**weeks** [1] - 56:21
**weigh** [1] - 61:16
**weight** [2] - 19:18, 20:2
**welcomed** [1] - 15:4
**West** [3] - 2:8, 2:10, 2:13
**Western** [1] - 30:5
**who've** [1] - 56:5
**whole** [2] - 35:5, 35:6
**wholesale** [1] - 10:21
**wide** [1] - 55:23
**wife** [7] - 10:24, 15:12, 16:4, 25:22, 27:21, 28:23, 55:2
**WILLIAM** [2] - 1:15, 2:9
**willing** [2] - 55:9, 60:22
**willingness** [1] - 61:2
**wish** [1] - 56:16
**witness** [2] - 12:7, 47:17
**witnessed** [3] - 16:22, 17:10, 25:22
**witnesses** [2] - 6:2, 6:9
**women** [2] - 24:15, 25:3
**word** [3] - 28:10, 47:10, 47:11
**words** [2] - 28:9, 54:4
**works** [2] - 62:12, 62:13
**world** [6] - 3:21, 22:9, 24:9, 25:16, 38:11, 43:14
**worldwide** [1] - 25:17
**worry** [2] - 25:12, 27:8
**worrying** [1] - 28:1
**worst** [4] - 22:10, 28:6, 35:18, 56:17
**worth** [2] - 63:17, 63:20
**writing** [1] - 64:23
**written** [2] - 44:11, 56:6
**wrongdoing** [1] - 41:4
**wrote** [5] - 19:15, 49:12, 54:20, 56:18, 56:20

## Y

**year** [6] - 16:18, 18:6, 19:22, 24:25, 61:24
**years** [25] - 7:23, 8:1, 8:2, 8:12, 9:6, 10:5, 10:17, 16:9, 21:24, 21:25, 23:12, 27:14, 27:20, 27:21, 27:22, 28:17, 43:25, 45:2, 49:9, 54:23, 57:4, 58:22, 61:23
**yesterday** [1] - 34:17
**young** [3] - 15:14, 26:14, 43:11
**younger** [1] - 21:13
**youngest** [1] - 27:10
**yourself** [3] - 6:22, 12:11, 15:23
**YouTube** [2] - 39:3, 39:8